[No. A120182. First Dist., Div. Three. Oct. 21, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
DUWAYNE BARTSCH, Defendant and Appellant.

**COUNSEL**

Jeremy Price, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, René A. Chacón, Masha A. Dabiza and Brent W. Wilner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SIGGINS, J.—Duwayne Bartsch appeals from the denial of his petition for restoration to sanity pursuant to Penal Code section 1026.2.[1] We conclude the court did not abuse its discretion when it denied the petition because Bartsch failed to establish his eligibility for transfer to outpatient status. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Bartsch stabbed his grandmother to death while under the influence of methamphetamine in 1995. He was found not guilty by reason of insanity and committed for a life term to the State Department of Mental Health. At the time of his commitment, Bartsch's primary diagnosis was amphetamine-induced psychotic disorder. In 2005, Bartsch filed a petition pursuant to section 1026.2 seeking to be placed on outpatient treatment. At the hearing on his petition, Bartsch produced evidence of his accomplishments while in the hospital, but his treating doctors testified that he needed further treatment and was not ready for release because he did not have an effective plan to prevent his relapse into substance abuse.

At the end of the hearing, the court clearly stated its reasons for denying Bartsch's petition. So, we will quote them at length: "I really do admire what Mr. Bartsch has done in getting these things together, but there are a couple of things that trouble me. And one of them is, and this is pointed out by, I think, Dr. Kennedy, said that he really needs to delve into the reasons, the insight into what went on and internalize this relapse prevention plan because he has these cravings. And the cravings come about in different ways. [¶] And one thing we saw here was when he really needed to be with his girlfriend, he would violate the rules, notwithstanding the fact that whether or not she had white powder or what the powder was or whatever it was, he violated the rules with her and went off grounds or out of bounds; and he did that regardless of the rules, because of his cravings. And this goes back to his plan. And what Dr. Kennedy says is that he needs to address some of the triggers and some of the things that really go into what causes him to have these cravings and then act upon them. [¶] And the only thing I can see—now, Dr. Kennedy is the one person treating him now. Dr. Blinder was good but he only saw him a couple of times and 10 years apart. The latest time was in 2007 for two hours. But Dr. Kennedy is his regular doctor. Dr. Aamot was his regular psychologist. And they both said he was not ready. And they spelled out specific reasons that he was not ready, not that he would not be ready. As one of your doctors said, if he's not ready now he'll never be ready. [¶] But I do see that it's very, very important for him to have insight

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

and to really get at the bottom of this relapse prevention plan other than to tell me that it's—I forget the words he told me—anger, it's just totally the anger, that's the only thing, and to stay away from slippery people. [¶] But that's really not enough. That's not enough insight considering the gravity of his meth problem. What would happen if he got out into the community even on CONREP [Conditional Release Program], even being monitored by CONREP? They're not with him 24/7. [¶] He's out there and he's faced with all kinds of people, all kinds of situations, and I am just not convinced, based on what he's told me and what I've seen and heard, that he is not going to be a danger to himself or others once he would be out in the community, even if on CONREP, coupled with the fact that his treating doctors don't feel he's ready, neither does CONREP, Mr. Hudack. [¶] And it's a very serious situation, and I would not want him to be out there being a danger to himself and others without the proper preparation. [¶] And I do admire him for what he's done. I do think he's close, as I said, but I think we do need periods of stability. We need for him to really take a look at what's going on with these cravings and this need to violate the law. [¶] And for that reason, the Court does not find by a preponderance of the evidence that Mr. Bartsch would not be a danger to himself or others. In fact the Court feels that it is likely that he would be a danger to himself or others were he to be released to CONREP right now. So he's going to be returned to Napa State Hospital forthwith."

The court denied the petition and Bartsch timely appealed.

### DISCUSSION

A person who has been found not guilty by reason of insanity and committed to a state hospital may apply to the superior court for release from commitment "upon the ground that sanity has been restored." (§ 1026.2, subd. (a).) "If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year." (§ 1026.2, subd. (e).)[2] "[T]he applicant shall have the burden of proof by a preponderance of the evidence." (§ 1026.2, subd. (k); see *People v. Sword* (1994) 29 Cal.App.4th 614, 624 [34 Cal.Rptr.2d 810] [placing burden of proof on acquittee did not violate due process because " 'it is reasonable to presume . . . that defendant's insanity . . . has continued to the date of . . .' [citation] . . . the release hearing"]; see also *People v. Beck* (1996) 47 Cal.App.4th 1676, 1684 [55 Cal.Rptr.2d 340] ["The commission of the crime [by the insanity acquittee] . . . supports an inference

---

[2] At the end of the one-year period, the court "shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder." (§ 1026.2, subd. (e).)

of potential dangerousness and possible continuing mental illness [citation], which justifies the state in exercising great care in evaluating the offender prior to release into the community."].)

We review the court's order for an abuse of discretion. (*People v. Cross* (2005) 127 Cal.App.4th 63, 73 [25 Cal.Rptr.3d 186].) "Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. [Citation.] '. . . [D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.' " (*Ibid.*)

Bartsch relies on the United States Supreme Court's decision in *Foucha v. Louisiana* (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780] to argue that due process required the trial court to grant his petition for transfer to outpatient status because "he was not exhibiting any signs or symptoms of mental illness at the time of the hearing." In *Foucha* the court considered the constitutional validity of a statute that "allow[ed] a person acquitted by reason of insanity to be committed to a mental institution until he is able to demonstrate that he is not dangerous to himself and others, even though he does not suffer from any mental illness." (*Foucha, supra,* at p. 73.) Relying on its earlier precedent in *Jones v. United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043], the court stated in *Foucha* that an insanity acquittee "may be held as long as he is both mentally ill and dangerous, but no longer." (*Foucha, supra,* at p. 77.)

In *Foucha*, a panel of three doctors appointed to review Foucha's sanity "reported that there had been no evidence of mental illness since admission and recommended that Foucha be conditionally discharged." (*Foucha v. Louisiana, supra,* 504 U.S. at pp. 74–75.) One of the doctors testified that upon his commitment Foucha "probably suffered from a drug induced psychosis but that he had recovered from that temporary condition." (*Id.* at p. 75.) This case is very different. Both of Bartsch's treating doctors described his currently diagnosed mental disorders and testified that he needed continued treatment before he would be ready for release.

Dr. Jack Aamot treated Bartsch from October 2006 to May 2007. He testified that Bartsch did not understand the triggers for his substance abuse and had not developed and internalized an effective plan to prevent his relapse.[3] In Dr. Aamot's opinion, despite the fact that Bartsch had "completed

---

[3] Dr. Aamot testified he "[had not] heard Mr. Bartsch articulate the triggers and the warning signs that would lead to relapse other than to stay away from slippery people." Dr. Aamot said Bartsch was not able to articulate an awareness of "how the cravings for drugs affect him, and how to take the necessary steps to mitigate those." At the hearing, Bartsch described his relapse prevention plan as "knowing my warning signs, my antecedents, knowing to stay away from slippery people, places, and things, and knowing that it's not okay to minimize, justify, to

some courses," he continued to require treatment for polysubstance dependence and amphetamine-induced psychosis. Dr. Aamot was also concerned because he saw Bartsch associate with an individual who was known to have used methamphetamine in the hospital. Dr. Aamot testified that if "someone who is a methamphetamine addict and is in remission . . . [is] associating with people that are known drug users . . . that puts him at great risk."

In Dr. Aamot's opinion, Bartsch needed to "[d]evelop and internalize a realistic substance abuse relapse prevention plan" before his release, and without such a plan he would "return to methamphetamine use during times of stress in the community." On cross-examination, Dr. Aamot acknowledged that Bartsch "currently shows no signs or symptoms of mental illness," but he reiterated on redirect examination that Bartsch was not yet ready for release from the hospital, and needed "to continue to work on his impulsivity and anger problems."

Dr. Morgan Kennedy began treating Bartsch at the end of May 2007, approximately six months before the hearing. Dr. Kennedy testified that amphetamine-induced psychosis is one of the most tenacious of mental disorders, and episodes may occur years apart. If Bartsch were to use methamphetamine, he would be "at risk of reciprocating or repeating his psychosis."[4] Dr. Kennedy testified that Bartsch needed further treatment because "he hasn't been able to demonstrate to us that he has a really solid plan to manage triggers and stressors in the community related to the amphetamine use and also to dangerous behavior and anger management." It was Dr. Kennedy's impression that Bartsch did not "clearly understand how his methamphetamine use led up to the killing of his grandmother," and that his relapse prevention plan needed more work. Dr. Kennedy opined that in his current state, Bartsch would pose a danger to society if released to the community and exposed to stress. (Cf. *People v. Williams* (1988) 198 Cal.App.3d 1476, 1478–1479 [244 Cal.Rptr. 429] [approving instruction stating jury could find sanity restored if insanity acquittee was no longer dangerous while in a medicated condition and would continue to take his medication].)

A May 2007 progress report that discussed Bartsch's readiness for conditional release was submitted to the court. The report noted Bartsch's diagnoses included polysubstance dependence in institutional remission,

any reason to use, good or bad." Bartsch also testified that after he filed his petition for release, he "wasn't thinking about breaking [hospital rules]" when he went out of bounds with his girlfriend, but he was thinking about satisfying their "needs."

[4] Dr. Tom Knoblauch treated Bartsch during 2004 and 2005. He testified on Bartsch's behalf and acknowledged that if Bartsch were to resume his use of methamphetamine, he would relapse back into psychosis. Dr. Knoblauch was unable to state whether Bartsch was ready to be discharged, and Dr. Knoblauch was not familiar with Bartsch's relapse prevention plan.

amphetamine-induced psychosis in remission, and personality disorder not otherwise specified.[5] Bartsch was not taking any prescribed medications for mental illness. He was "currently not exhibiting any signs or symptoms of mental illness," and his "current focus of treatment [was] for a substance abuse and anger management deficit." The report concluded: "Upon his further demonstration of [his] new pro-social behavior [as evidenced by a recent 'peacekeeper' award], it is our opinion that Mr. Bartsch could be transferred to an open unit, where he could further progress toward his discharge criteria. Upon such a successful transition, consideration for discharge could be examined." But the report also cautioned that "premature release to the community would be a danger to the health and safety of others, due to a mental defect, disease, or disorder. Therefore, it is the recommendation of the treatment team that Mr. Bartsch continue inpatient treatment and remain at Napa State Hospital."

All the clinicians who testified at Bartsch's hearing described his substance abuse disorders to be in remission, not recovery.[6] The distinction is important. An individual is in remission when "[t]here are no longer any symptoms or signs of the disorder, but it is still clinically relevant to note the disorder. . . . After a period of time in full remission, the clinician may judge the individual to be recovered and, therefore, would no longer code the disorder as a current diagnosis. The differentiation of In Full Remission from recovered requires consideration of many factors, including the characteristic course of the disorder, the length of time since the last period of disturbance, the total duration of the disturbance, and the need for continued evaluation or prophylactic treatment." (American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 text rev.) p. 2.) Bartsch carries current diagnoses of polysubstance dependence and amphetamine-induced psychosis. Both are in remission, but his clinicians do not yet describe Bartsch as recovered.[7] The presence of currently diagnosed conditions means that the outcome of Bartsch's petition turns on his potential danger to the

---

[5] Dr. Martin Blinder, a psychiatrist who testified for Bartsch, diagnosed him with "[a]mphetamine psychosis, largely in remission." Dr. Blinder believed Bartsch was "legally sane" and his risk of relapse into use of methamphetamine if released into the community was "not zero, but it's low." But Dr. Blinder also testified: "As long as he doesn't have an amphetamine psychosis, he's not going to go knocking people around and certainly not going to go killing people and I think that's our primary concern. If he gets back on amphetamine, all bets are off."

[6] Webster's Third New International Dictionary (1966) at page 1920 defines "remission" as "a temporary abatement of the symptoms of a disease."

[7] We do not suggest that Bartsch must be fully recovered before he can be released. The law does not require it. Clinicians may determine that even though he is only in remission, Bartsch's risk of relapse has diminished to the point where he would no longer present a threat to public safety if he is placed in outpatient treatment.

community upon his release. And there unquestionably is substantial evidence that, in his current condition, Bartsch continues to pose a danger to the public.

██ Bartsch's case is very different from *Conservatorship of Benvenuto* (1986) 180 Cal.App.3d 1030 [226 Cal.Rptr. 33] and *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15 [184 Cal.Rptr. 363]. Those were civil conservatorship cases brought under the Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.) where the conservatees sought release because their disorders were controlled and they had no current symptoms. The courts determined they were not "presently" gravely disabled within the meaning of the conservatorship statute. (*Benvenuto, supra,* at pp. 1033–1034; *Murphy, supra,* at pp. 18–19.) Bartsch, on the other hand, was found not guilty by reason of insanity. While the standard for determining dangerousness in the *criminal* insanity statutes has been adapted to the conservatorship standards for criminal incompetence (*Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176 [167 Cal.Rptr. 854, 616 P.2d 836]), *civil* conservatorship cases like *Benvenuto* and *Murphy* are different.

The LPS Act provides for the involuntary civil commitment of gravely disabled persons. (Welf. & Inst. Code, § 5000 et seq.) Such commitments may continue so long as the conservatee is presently gravely disabled and recently threatened or inflicted another with harm. (*In re Smith* (2008) 42 Cal.4th 1251, 1267–1268 [73 Cal.Rptr.3d 469, 178 P.3d 446].) Under the LPS Act, the diagnosis of a mental disorder and predictions of future behavior alone are insufficient. (42 Cal.4th at p. 1269.) But those mentally ill persons who are in the criminal justice system may be treated differently than those who are civilly committed.

██ Under section 1026.2, subdivision (e), it was Bartsch's burden to show that if he is released, he "will not be a danger to the health and safety of others, due to mental defect, disease, or disorder." Bartsch's treating clinicians testified that he has a mental disorder and expressed their opinion that he is not ready to be safely released to outpatient treatment.

The court did not abuse its discretion when it concluded that Bartsch failed to meet his burden.[8] (§ 1026.2, subds. (e), (k).) The petition was properly denied.

---

[8] Because we conclude Bartsch failed to make the showing required by section 1026.2, subdivision (e), we do not address the Attorney General's additional argument that "in certain narrow circumstances persons who pose a danger to others or to the community [and are not mentally ill] may be subject to limited confinement."

DISPOSITION

The judgment is affirmed.

McGuiness, P. J., and Pollak, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 21, 2009, S168565.