Filed 8/29/14  P. v. Greer CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C072904 |
| Plaintiff and Respondent, | (Super. Ct. No. CM013638) |
| v. | |
| CHEYENNE GREER, | |
| Defendant and Appellant. | |

Defendant Cheyenne Greer appeals the denial of her petition to transfer her to outpatient treatment pursuant to Penal Code section 1026.2.[1]  She contends she met her initial burden of establishing a prima facie case that she would not present a danger to others if she were released under the supervision of the conditional release program (CONREP) and the People did not produce sufficient evidence to rebut that presumption. We disagree and affirm the order of the trial court.

---

[1]     Undesignated statutory references are to the Penal Code.

1

BACKGROUND

In February 2000 defendant, responding to command hallucinations, killed her three-month old daughter by smothering her with a pillow and then attempted to kill herself by driving her car into a pole. Defendant had stopped taking her medications shortly after becoming pregnant and stopped seeing her therapist. At the time of the crime, Dr. Kent Caruso evaluated defendant and diagnosed her as schizophrenic. Dr. Caruso reported defendant suffered from hallucinations and paranoia. He attributed her murder of her child and attempted suicide to a "perfect storm" of college, family problems, relationship difficulties, stress from having to care for her child and hormonal and chemical imbalances. Defendant was acquitted of murder by reason of insanity and committed to the California Department of State Hospitals. In 2003, defendant transferred to Napa State Hospital (Napa). In September 2011, defendant filed a petition requesting a transfer from Napa to outpatient care under section 1026.2 as the first step in a restoration of sanity proceeding.

Defendant's history at Napa demonstrated numerous periods of aggressive, inappropriate behavior, and destabilization. In 2007, defendant was "extremely paranoid and agitated . . . . She had a number of incidences [*sic*], one where she . . . attempted to kick a male peer, another time where she did assault a female and was placed in five-point restraints . . . . She was having a very difficult time with her symptoms. They were quite active in 2007." She was also having visual and auditory hallucinations. There were acts of "aggression with female peers" and "paranoid symptoms around her roommates at the time. [¶] . . . [¶] [S]he would cycle through periods of being afraid, specifically afraid of certain female peers." She was also verbally aggressive with female peers. She thought the treatment team was trying to poison her and became aggressive with staff. Her aggression was due to her psychosis, usually hallucinations or delusions. In 2008 "she expressed aggressive behavior by yelling at a peer." She also exhibited hypersexual behavior that was against the unit rules, "involving inappropriate touching

2

of peers" and staff. In 2011, she "was having problems with thinking that she was being molested by her roommate, had tactile hallucinations." The hospital had to move her and adjust her medication. She did not like her medication and stopped taking it. She was placed on a different medication. In May 2011, "she began paranoid focus on another roommate who she believed was sexually molesting her while she slept." She believed the roommate was giving her spiritual babies. She also had delusions she was pregnant.

In 2012, defendant was assigned to Dr. Carol Humphreys' caseload. Dr. Humphreys is a unit psychologist at Napa. At that time, a treatment plan was designed for defendant, which defendant was working on, including engaging in treatment groups and completing her Wellness and Recovery Action Plan (WRAP). Defendant's triggers include family dilemmas, "any kind of situation that she feels out of control in" and "ruminating on her past." Her precursors include irritability, hypersexuality and supernatural spirits talking to her. As to her relapse prevention plan, Dr. Humphreys noted defendant had a "number of things that she has been able to demonstrate off and on . . . that she uses when she begins to feel interpersonally stressed."

Defendant had occupational training at a beauty parlor in the hospital which was helpful to, as well as motived, her. However, there were also times when, because of her manic periods and paranoia, she would have to be "pulled" from her job, as it was not a safe place for her to work. Those manic periods were characterized by obvious flights of ideas, pressured speech, paranoid thoughts, and responses to auditory hallucinations. One outward sign of these hallucinations occurred when defendant giggled, laughed, and talked to herself in the hallway, in her room and in group sessions. "The paranoia would be an escalating experience of feeling afraid, of really questioning other people's motives, of feeling fearful for herself that someone's treating her unjustly, poorly, being frightened." Dr. Humphreys and defendant spoke often about defendant's difficulties with her supervisor. Defendant was "extremely uncomfortable" talking to her supervisor and, "within just a week or two period [of] time it went from a slight irritation to what

[Dr. Humphreys] felt was quite paranoid that [defendant] could not even go to her job." Defendant repeatedly spoke with Dr. Humphreys about eventually wanting a "normal life," and to get married and have children. Although they also spoke about the risk having children represented, defendant still "seemed to want that."

Dr. Humphreys recommended against outpatient treatment for defendant. Dr. Humphreys acknowledged she had previously supported transfer of defendant to an open unit, as she had generally good behavior and was one of the higher functioning patients. She acknowledged they were not seeing signs of verbal or physical aggression in defendant and defendant was attempting to use her coping skills. Defendant was cooperative with her medications, participating in her groups and developed a relapse prevention plan. Nonetheless, as of May 2012, Dr. Humphreys believed there "were still episodes of [defendant] feeling guarded or suspicious or paranoid." Dr. Humphreys remained "concerned that her symptoms were still breaking through. And . . . concerned over the fact that [she] spoke with [defendant] many, many times about her giggling and laughing and talking to herself in the hallway. And [Dr. Humphreys] always asked 'What was that about?' And [defendant] almost always said she was thinking of a boyfriend on another unit and that that made her laugh and that she was thinking of other things. And [Dr. Humphreys] felt there was a lack of insight around whether or not those were related to her symptoms. . . . [¶] . . . [Dr. Humphreys] thought she was starting to show some insight around [her symptoms]. But, [Dr. Humphreys] didn't feel it was a long enough period of time." Based on defendant's quickly escalating concerns and paranoia regarding her supervisor, her breakthrough symptoms of hallucinations and "talking" with supernatural spirits, her irritability, hypersexuality, and insufficient duration of stability with her medication, and the similarity of these symptoms to those she was displaying at the time of her offense, Dr. Humphreys concluded defendant would be a risk if released to outpatient status because she would be without the intense structure and support obtainable in a state hospital like Napa.

4

Dr. Leif Skille became defendant's primary treating psychiatrist at Napa in May 2012. He testified that defendant had been diagnosed with schizophrenia and reported she "struggled with depression in the past superimposed upon ongoing psychotic illness." Her primary symptoms are hallucinations and delusions. Dr. Skille reported defendant was "quite psychotic" in May 2012. "She was having spiritual warfare, she was having multiple symptoms." In June 2012, she was "hallucinating as we were speaking," seeing things and hearing voices she described as "positive" and "Goddesses." She denied these voices were part of her mental illness, but claimed they were just a " 'spiritual connection.' " She thought her thoughts could be heard by other people and believed other people could put thoughts in her head. She believed the television was giving her special messages. In July 2012, defendant reported "people are shooting bullets in spiritual warfare." Dr. Skille reported over the years, when defendant starts to get paranoid, she can become agitated and as that psychotic agitation increases, she can be aggressive.

Dr. Skille hoped defendant could eventually be recommended for outpatient status, but did not think she was ready yet. He indicated he would want to see better control over her hallucinations and delusions, particularly because they expressed similar religious themes "which led to her ending her child's life." He also believed she needed improved insight into her mental illness. Although she recognized she had a mental illness, she did not recognize when she was experiencing symptoms of that illness. He was also concerned about her comments to Dr. Martin[2] expressing an interest in getting pregnant. She had suggested she would stop taking her medications so as not to harm the fetus, and was not worried about the risk as she now had social support. Dr. Martin concluded defendant did not appreciate "the significance of her mental illness and how it

---

**2** Dr. Martin is another of defendant's treating doctors.

played a role in her instant offense." Dr. Skille concluded defendant did not understand "how risky it is to just stop her meds and get pregnant again." Dr. Skille thought defendant was "underappreciating the totality of her mental illness."

The court appointed independent expert Dr. Kent Caruso for defendant. Dr. Caruso originally examined defendant as part of her NGI[3] evaluation. For this evaluation, he met with defendant twice, once in January 2012 and once in October 2012. He also reviewed reports dating back to 2010. Dr. Caruso diagnosed defendant as schizophrenic. Dr. Caruso reported at the time of the offense, defendant had no psychopathy or sociopathy, she was not violent and had not exhibited violent behavior in the community or committed any other criminal acts. He described the committing offense as having occurred while she was having some family problems and relationship difficulties, she was increasingly stressed and anxious during the pregnancy and after the birth of the baby she did not have much insight and "started becoming paranoid and delusional." He believed, "absent that perfect storm, that set of circumstances, the stressors in her life at that time of college, relationship problems, and having the baby, the hormonal and chemical changes in her body, and then having to be a mother, that absent that combination of stressors, she's not really inclined to be a danger to others." He was unaware of any acts of aggression or violence during her commitment. He acknowledged she could become suspicious and paranoid at times, but "I think all of us can. . . . But I don't think I've ever read anything that said she's been a danger to staff or aggressed upon staff or been a danger to other patients at Napa." Dr. Caruso reported defendant recognized she had a mental illness and needed medication and had developed a wellness recovery plan. Defendant becoming pregnant again, Dr. Caruso warned, would be her "most predictable trigger to any future violent behavior" and if she were to

---

**3**     Not guilty by reason of insanity.

6

become pregnant again, he would be concerned about her release. In the interview, he told defendant having another child would be a very bad idea, and she gave what he described as an appropriate and pragmatic response, acknowledging she should not have a baby. Dr. Caruso expected her condition would improve in a change of environment, including reduction of symptoms that "seem to keep arising here and there." He did acknowledge, however, that she had "some de-stabilization" when she had previously been moved to a different unit as she was uncomfortable with the changes. But, he explained "she was just feeling that she didn't have some of the opportunities for consistency and continuity and maybe ongoing, good ongoing therapeutic relationship or rapport with staff members. And then, of course, this, in turn, affected her mood and her thoughts about her improvement or her program." Dr. Caruso was unaware of the incidents in 2007 or 2008. As to the 2008 incident of verbally aggressive behavior of "yelling at a peer," Dr. Caruso stated, "I yell at my kids sometimes." He was not aware of a report that she was placed in restraints after assaulting a peer in 2007. Nor was he aware of reports that she had "attempted to kiss a male peer on the lips." In response, he indicated, "I've got to smile because those are very normal behaviors for people even in mental institutions and correctional settings." Dr. Caruso concluded defendant was ready to be released to the outpatient program.

After considering the evidence, the trial court denied the petition to transfer to outpatient placement "[b]ased on everything that's been presented, primarily the testimony of Dr. Skille."

DISCUSSION

Defendant contends the trial court erred in denying her petition as "the record is lacking in evidence that [she] would present a danger to others if under the supervision of the [conditional release] program." We find the record contains ample evidence supporting the trial court's order.

7

A defendant found not guilty by reason of insanity may thereafter be released from the state hospital upon the occurrence of one of three events: "(1) the restoration of sanity pursuant to the provisions of section 1026.2; (2) expiration of the maximum term of commitment, which means 'the longest term of imprisonment which could have been imposed for the offense or offenses of which the person was convicted' (§ 1026.5, subd. (a)(1)); or (3) approval of outpatient status pursuant to the provisions of section 1600 et seq. (§ 1026.1; see *People v. Soiu* (2003) 106 Cal.App.4th 1191, 1194-1195 (*Soiu*).)" (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1432.) Here, after being found not guilty by reason of insanity and committed to a state hospital, defendant sought release based upon restoration of sanity pursuant section 1026.2. "Such a petition involves a two-step process. [Citations.] The first step requires the person to apply for release to the superior court of the county from which the commitment was made. (§ 1026.2, subd. (a).) . . . Once the application is filed, the court must conduct a hearing, commonly called the outpatient placement hearing. (§ 1026.2, subd. (a); see *Soiu, supra*, 106 Cal.App.4th at pp. 1196–1197.) [¶] At the outpatient placement hearing, which is the type of hearing that was held in this case, the applicant must demonstrate [she] will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community.' (§ 1026.2 , subd. (e) []; see *Soiu, supra*, 106 Cal.App.4th at p. 1196.)" (*Dobson, supra*, 161 Cal.App.4th at p. 1432, italics omitted.) "The applicant has the burden of proof by a preponderance of the evidence. [Citations.]" (*Dobson, supra*, 161 Cal.App.4th at p. 1433.)

" 'Outpatient status is not a privilege given the [offender] to finish out [her] sentence in a less restricted setting; rather it is a discretionary form of treatment to be ordered by the committing court only if the medical experts who plan and provide treatment conclude that such treatment would benefit the [offender] and cause no undue

8

hazard to the community.' [Citation.]" (*People v. Sword* (1994) 29 Cal.App.4th 614, 620 (*Sword*).)**4**

"We review the court's order for an abuse of discretion. (*People v. Cross* (2005) 127 Cal.App.4th 63, 73.) 'Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion. [Citation.] "... [D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." ' (*Ibid.*)" (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900.)

As each doctor noted, defendant has shown improvement over the years and demonstrated good behavior on occasion. Nonetheless, despite being in a highly structured and supervised environment, she continues to have breakthrough symptoms of her mental illness which result in aggressive and inappropriate behavior. These periods of aggressive behavior are fueled by her continued hallucinations and delusions: hallucinations and delusions which are similar in character to those she was experiencing when she murdered her child, and which she denies are caused by her mental illness. When she murdered her child, defendant was experiencing hallucinations, religious themed delusions, and extreme paranoia. Throughout her time in Napa, she experienced hallucinations and delusions which resulted in aggressive behavior, against both peers and staff, serious enough to require physical restraint. As recently as 2012, she continued to experience auditory hallucinations, religious delusions, and paranoia. Her incidents of

---

**4** Defendant points out *Sword* was a case under section 1600, approval of outpatient status, not section 1026.2, restoration of sanity. However, as *Sword* noted, "Outpatient status is a prerequisite to a finding that sanity has been restored. (§ 1026.2.) 'Subdivision (e) of section 1026.2 sets up a two-step process for processing an application for release: first, a determination of whether the applicant should be placed in a local program, and later, after a year in such a program, a determination of whether the applicant's sanity has been restored.' [Citations.]" ( *Sword, supra,* 29 Cal.App.4th at p. 620.) Thus, the statement in *Sword* is equally applicable to the first step in the proceedings for restoration of sanity under section 1026.2 as it is to proceedings for approval of outpatient status.

paranoia included sexual themes including molestation and pregnancy. As recently as June of 2012, she denied her delusions were part of her mental illness, but claimed they were just a " 'spiritual connection.' " While defendant received occupational training, she also had to be removed from that job based on paranoid delusions. Those delusions led to the conclusion she could not safely continue in her job. While operating under paranoid delusions, defendant was aggressive with both peers and staff. At one point, the aggression was serious enough she had to be placed in restraints. This aggressive behavior is evidence that defendant would be a risk if placed in outpatient treatment. Defendant has identified triggers of her mental illness, however, she lacks insight into her mental illness and specifically that her symptoms are a manifestation of that mental illness. Nor does she appreciate the role her mental illness played in her killing her child. Every evaluating doctor recognized the risk defendant would present should she get pregnant again. In addition to exhibiting hypersexualized behavior, defendant giggled and laughed while having apparent delusions about her "boyfriend" and stated her interest in having another child. Dr. Skille concluded defendant did not understand the risk of stopping her medications and getting pregnant again. When considered in context, it is a reasonable inference defendant's hypersexualized behavior and lack of insight into her mental illness are evidence of a risk if she were released to outpatient status. Moreover, both the hypersexual and aggressive conduct indicates an inability to follow the rules of the institution, even in a highly structured and supervised setting. This inability raises a reasonable inference of risk if defendant were released to outpatient status. Drs. Humphreys and Skille were optimistic defendant may eventually be moved safely to outpatient status, but felt she needed to exhibit better insight into her mental illness, better control of her symptoms and a longer period of stability on her medications.

Given this record, we conclude the trial court acted neither arbitrarily nor capriciously in denying defendant's petition for conditional release into CONREP. (See

10

*People v. Sword, supra*, 29 Cal.App.4th at p. 626.)  Rather, the trial court's decision was based on the substantial evidence presented at the hearing that defendant "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community."  (§ 1026.2, subd. (e).)

## DISPOSITION

The order of the trial court denying defendant's petition for conditional release into CONREP is affirmed.


    NICHOLSON    , Acting P. J.


We concur:


    DUARTE    , J.


    HOCH    , J.