Filed 7/6/22  P. v. Ruiz CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094279 |
| Plaintiff and Respondent, | (Super. Ct. No. 00F05144) |
| v. | |
| GREGORY RUIZ, | |
| Defendant and Appellant. | |

Defendant Gregory Ruiz pled guilty to assault with a deadly weapon, was found not guilty by reason of insanity, and was committed to the State Department of State Hospitals. Defendant was conditionally released to outpatient treatment, but his outpatient status was revoked after he was convicted of driving under the influence of alcohol in 2020.  Shortly thereafter, defendant petitioned the trial court to be returned to outpatient treatment under Penal Code[1] section 1026.2.  The trial court denied the petition, finding defendant was a danger to the health and safety of others due to mental defect, disease, or disorder.  Defendant appeals, arguing the trial court's decision is not supported by sufficient evidence.  We affirm.

---

[1]     Undesignated section references are to the Penal Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *Underlying Offense*

In 2000, defendant, while suffering from paranoid delusions and hallucinations, stabbed a maintenance worker who entered his apartment to make a repair. The prosecution charged defendant with assault with a deadly weapon and alleged defendant had inflicted great bodily harm, and that he had three prior strike convictions. Defendant pled guilty. The trial court found him not guilty by reason of insanity and committed him to the State Department of State Hospitals.

In 2013, defendant was released to outpatient treatment with the conditional release program (CONREP). In February 2020, defendant was driving and crashed into a sign near a freeway off-ramp. Defendant had a blood-alcohol content of 0.12 percent and had been drinking for several months before the crash. The court revoked defendant's outpatient status.

### II

### *Petition For Outpatient Treatment*

In September 2020, defendant applied to be released to outpatient status under section 1026.2. The trial court held a trial on the matter. Psychologists Christopher Fisher and Brittany Cunningham testified for defendant. Defendant also testified. The People called social worker Paul Cervelli and psychologist Camille Morgan.

### III

### *Christopher Fisher*

Christopher Fisher, a forensic psychologist, had previously treated defendant at Napa State Hospital, but was currently in private practice and was retained by defendant. To evaluate defendant, Dr. Fisher had reviewed defendant's treatment records, legal documents about his underlying offense, and interviewed defendant multiple times. Dr. Fisher explained the circumstances of defendant's initial offense and said defendant's paranoid delusions at the time

had been caused by schizoaffective disorder. Defendant had not been taking his prescribed medication at the time. Alcohol could interfere with defendant's medication.

Dr. Fisher evaluated defendant in 2019 and determined that his schizoaffective disorder "no longer caused him to be a danger to the health and safety of others." Defendant's medications were managing his schizoaffective disorder symptoms. Were defendant to decompensate, he might notice small symptoms of paranoia and auditory hallucinations that would gradually grow over a period of weeks or months. At the time of the evaluation, it had been 15 years since defendant had used any drugs or alcohol. Defendant had relapsed when he was driving under the influence of alcohol, but that could have been an isolated event that did not signify he would abuse substances in the future.

Dr. Fisher evaluated defendant again in 2021. Defendant had unsuccessfully sought unconditional release in 2019 and became "rebellious." As a result, he started drinking on weekends because he felt he was being treated unfairly by CONREP. His drinking spiraled out of control, he stopped taking his medication, and hid his activities from CONREP. Defendant had been drinking for five to 10 months before the crash and had not told anyone at CONREP that he was drinking.

Dr. Fisher diagnosed defendant with alcohol use disorder. At the time of the evaluation, defendant acknowledged he had made a mistake. He recognized that he would need to prioritize the treatment of his disorders. Defendant was able to "critically examine" what he had done incorrectly, which Dr. Fisher felt demonstrated insight. Dr. Fisher believed defendant could be successful on CONREP. Given his treatment at the state hospital since he had been readmitted, Dr. Fisher felt it would be safe to return defendant to CONREP.

IV

*Brittany Cunningham*

Brittany Cunningham, a psychologist at Napa State Hospital, treated defendant in 2020. She declined to offer an opinion as to whether defendant should be released to outpatient status because she had not conducted a violence risk assessment.

Defendant had shown good insight into the factors that caused the revocation of his outpatient status and could discuss the causes of his relapse. He had not decompensated or shown any behavioral problems. He also showed understanding about how alcohol use disorder interacted with schizoaffective disorder. He was taking his medication and had no positive drug or alcohol tests.

V

*Defendant*

Defendant testified on his own behalf. Defendant explained the car accident occurred after he lost his unconditional release trial in 2019; CONREP had not supported his petition for release, and, as a result, he lost trust in CONREP. He identified lack of trust as a trigger for his alcoholism. Before the crash, he had been using alcohol for about five months, but did not tell anyone because he was worried it would affect his prospects for unconditional release. He also was not taking all his medication. He acknowledged that this "probably" would have resulted in a relapse of his schizoaffective symptoms at some point.

Before his relapse, defendant had been working pouring cement for highway construction. Defendant would carpool with coworkers to job sites. He did not tell his coworkers about his history because he was worried he would not be called back to work if he did. Once, a coworker drank beer while defendant was riding in his car. At the time, seeing his coworker drink did not make defendant crave alcohol, but he later tried asking the coworker to get a drink with him.

When defendant was first released to outpatient treatment, he had been consistently attending Alcoholics Anonymous (AA) meetings. Around 2016, however, he began to lose contact with his sponsor. In 2017, he stopped providing meeting sign-in sheets to CONREP because he had been sober for so long that he did not see a need for it. Defendant admitted that he also had not been forthcoming to CONREP about his living situation and change in marital status.

4

Defendant said he was prepared to return to CONREP and understood he would need to start from the beginning in the program.  He recognized what he had done wrong and was now more willing to rely on his support network.  He understood that his treatment would continue for the rest of his life.  He had completed relapse prevention plans with appropriate steps to negotiate difficult situations.  He had also been working through AA at the state hospital and was participating in several other programming opportunities.

## VI

### *Paul Cervelli*

Paul Cervelli, a social worker at CONREP, was defendant's primary clinician from 2013 to 2020 and testified for the People.  When defendant was on CONREP, he generally abided by the terms of his outpatient release.  Defendant had difficulty, however, complying with his AA attendance requirements.  This lack of compliance made defendant's relapse more likely and made him more dangerous to society.  Defendant was able to evade these requirements because Cervelli "cut [defendant] some slack" while defendant was in CONREP; defendant would not enjoy similar freedom in a state hospital.

To enter outpatient treatment, a patient should be aware of the mental illness, know medications and the importance of those medications, know triggers for substance abuse, understand how the substance abuse had affected behavior, and understand the behavioral chains that lead to decompensation or relapse.  Cervelli did not know whether defendant was prepared for release to outpatient care and noted the state hospital had not told CONREP defendant was "ready to go."  CONREP had not supported defendant's petition for release in 2019 because it was important for him to complete his program at CONREP, and the subsequent relapse demonstrated defendant was not "ready to be on his own."

## VII

### *Camille Morgan*

The People called Camille Morgan, a psychologist at Napa State Hospital, to testify about her evaluation of defendant.  To conduct her future risk assessment, Dr. Morgan reviewed

5

defendant's medical and legal records, interviewed defendant, and applied that information to the Historical Clinical Risk Management-20, version three, a "structured professional judgment measure" used to evaluate risk factors for future violence. Dr. Morgan conducted a future risk assessment of defendant and determined he posed a high risk of future dangerousness if released to community outpatient treatment.

Dr. Morgan based this opinion on her analysis of defendant's risk factors. His historical factors included the presence of schizoaffective disorder bipolar type, severe alcohol use disorder, and severe methamphetamine use disorder. Defendant's previous treatment and supervision had also been insufficient to prevent future episodes of violence. As to his current clinical status, Dr. Morgan noted defendant's psychiatric symptoms were in remission and his major mental disorder was well managed. But defendant seemed to lack insight "into the impact, seriousness and appreciation for his substance use disorder" based on the car crash, the concealment of his alcohol use, and apparent noncompliance with his medications. Defendant told Dr. Morgan that he did not intend to use alcohol again, but Dr. Morgan noted that defendant had said similar things before and it had not prevented his relapse.

Dr. Morgan identified three specific areas of insight that concerned her. First, defendant lacked insight into his impaired judgment leading up to his relapse. Defendant explained his relapse had been caused by seeing a coworker drink and he told Dr. Morgan that he would like to have a closer friendship with that coworker. To Dr. Morgan, this signaled impaired judgment because defendant did not recognize that this could be a poor decision. Defendant still perceived alcohol as a way to facilitate closer relationships and had difficulty picking people with whom he could form appropriate social relationships.

Second, defendant lacked insight into his need for clinical assistance and supervision. Two months elapsed between when defendant had seen his coworker drinking until he actually started drinking himself, but he did not seek support from CONREP in that time. He was not attending AA meetings as frequently as he was supposed to and said he did not want to seek help because he was afraid it would harm his chances at unconditional release.

6

Third, defendant lacked insight into the effect stressors may have had on his substance use. Defendant married a woman, but she moved out of his home within a week of moving in. Defendant did not appear to understand how this could have been a stressor that contributed to his substance use. Defendant also had not told his wife about the extent of his substance abuse problems, which Dr. Morgan found concerning. To Dr. Morgan, this was part of a "broader pattern where [defendant] was not appreciating the importance of being transparent."

Dr. Morgan explained defendant's substance use and schizoaffective disorder interacted such that future instances of substance use could lead to "psychiatric deterioration." She believed defendant could obtain sufficient insight over time, but currently presented a high risk of dangerousness.

## VIII

### *Court's Ruling*

The trial court denied defendant's application in an oral ruling. Explaining that it found Dr. Morgan's testimony to be "highly persuasive," the court acknowledged the progress defendant had made, but noted defendant made poor relationship choices. Defendant had problems being "honest with others"; the court identified several situations "over many months and in many different situations" where defendant had lied or had not been open with others, including those in his support system, CONREP, and his coworkers. This indicated defendant was "more likely to engage in risky behaviors in the future." The court also believed defendant did not have a concrete plan aside from saying he was "going to rely on [his] support network" more. The court concluded that defendant "didn't get over that hurdle for me . . . by a preponderance of the evidence that [defendant is] not dangerous."

## DISCUSSION

Defendant argues the trial court's decision was not supported by sufficient evidence because he established "he is no longer a danger to others if on supervised conditional release" and "the prosecutor failed to rebut that evidence with substantial evidence." In particular,

7

defendant argues Dr. Morgan's opinion was not well founded because it relied on facts that were contradicted by defendant's testimony.

"A person who has been found not guilty by reason of insanity and committed to a state hospital may apply to the superior court for release from commitment 'upon the ground that sanity has been restored.' " (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 899.) "The court shall hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community. If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year." (§ 1026.2, subd. (e).)

The defendant "shall have the burden of proof by a preponderance of the evidence." (§ 1026.2, subd. (k).) To carry his or her burden, the defendant must show "that [he or] she is '*either* no longer mentally ill *or* not dangerous.' " (*People v. McDonough* (2011) 196 Cal.App.4th 1472, 1491.) "The court makes the final determination: '[I]t is still the judiciary, not the medical experts, which decides whether to release a defendant who has been found to have committed a criminal act while insane.' " (*People v. Michael W.* (1995) 32 Cal.App.4th 1111, 1119.)

Defendant urges us to apply a substantial evidence standard of review to the trial court's order, consistent with *People v. Rasmuson* (2006) 145 Cal.App.4th 1487, which applied the standard to an order regarding a sexually violent predator seeking outpatient release. Defendant acknowledges, however, that the courts in *People v. Bartsch*, *supra*, 167 Cal.App.4th at page 896 and *People v. Dobson* (2008) 161 Cal.App.4th 1422 reviewed decisions under section 1026.2 for abuse of discretion. The People respond that the distinction is academic in this instance, and that the conclusion is the same under either standard. We agree and conclude the trial court's decision was adequate under either standard of review.

The trial court denied defendant's petition based on Dr. Morgan's testimony and it articulated three reasons why defendant still posed a high risk of dangerousness to others. Each of the identified rationales was supported by specific evidence, such as defendant's poor judgment in attempting to befriend a coworker who drank beer while driving, his failure to seek support from CONREP, and his responses to Dr. Morgan about his relationship problems. In Dr. Morgan's opinion, if defendant were to use alcohol again, it was "likely" that he would "psychiatrically decompensate," which, historically, had caused defendant to behave violently. Thus, it would be dangerous to release defendant into the community.

Defendant argues Dr. Morgan's testimony was unsupported by the evidence because he demonstrated in his own testimony that he had insight into the three categories she identified. But the trial court noted defendant was not credible, a conclusion we do not review. (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.) That defendant gave testimony inconsistent with his behavior, as observed by Dr. Morgan, does not mean that Dr. Morgan's opinion lacks a factual basis, and Dr. Morgan offered a "reasoned explanation" why the behaviors she observed were indices of defendant's risk of dangerousness, which is all that was required to credit her testimony. (*Ibid.*)

Finally, we are unpersuaded by defendant's reliance on *People v. Dunley* (2016) 247 Cal.App.4th 1438 to argue defendant was entitled to outpatient release under the equal protection clause of the United States and California Constitutions. *Dunley* considered only whether mentally disordered offenders were similarly situated to defendants not guilty by reason of insanity for the purposes of the testimonial privilege, which is not at issue here, and defendant does not explain why the two are similarly situated for the purpose he asserts. (*Dunley*, at p. 1449-1450; see *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [in an equal protection claim, the "initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged' "].)

Of the experts who opined on defendant's risk to public safety, Dr. Fisher believed defendant could be safely returned to CONREP and Dr. Morgan testified defendant posed a high

9

risk of future dangerousness if returned to CONREP. The trial court heard testimony from both and resolved the conflicting testimony in favor of Dr. Morgan, which it was entitled to do. We see no error in the trial court's order.

DISPOSITION

The trial court's order denying the petition is affirmed.


/s/_____

Robie, Acting P. J.

We concur:


/s/_____

Mauro, J.


/s/_____

Earl, J.

10