Filed 12/2/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

WENONAH KAREN PARKER,

    Defendant and Appellant.

E057890

(Super.Ct.No. FVI1010342)

OPINION

APPEAL from the Superior Court of San Bernardino County. Katrina West, Judge. Affirmed.

Laurel M. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2000, defendant and appellant Wenonah Karen Parker was found guilty, but not guilty of various crimes by reason of insanity. (Pen. Code, § 1026.)[1] Defendant was committed to Patton State Hospital (Patton). In 2011, the trial court granted defendant outpatient status. (§ 1026.2.) The outpatient agencies refused to accept defendant due to her behavior and mental condition. As a result, defendant remained hospitalized at Patton, in the inpatient program. In 2012, the trial court revoked the order granting defendant outpatient status. (§ 1608.)

Defendant raises three issues on appeal. First, defendant contends the Department of Mental Health and the outpatient treatment agencies acted unlawfully by refusing to admit defendant. Second, defendant asserts the controlling statutes do not authorize revocation of outpatient status for a person who was not given the opportunity to participate in an outpatient program. Third, defendant contends collateral estoppel requires defendant's outpatient status to remain in place because there were not material changes to defendant's condition. In defendant's Appellant's Reply Brief, she also raises an issue concerning substantial evidence. We affirm the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

A.    BACKGROUND

In 1994, defendant had surgery to remove a cyst in her vaginal area. Defendant believes the surgeon intentionally disfigured her labia and cut her vaginal artery, which defendant believes is causing her to bleed internally, despite the artery being four inches

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

from the surgery site and no incisions being made in her vaginal wall. Defendant also believes the doctor is a member of a cult that harms women.

On August 20, 1999, defendant entered the doctor's office with a .22-caliber revolver and ordered the doctor to the floor. Defendant discharged two rounds into the ceiling and ordered the receptionist to assist with handcuffing the doctor. Defendant then waited for the media to arrive so she could "'expose'" the doctor. Law enforcement arrived, and defendant engaged in a standoff for approximately 20 minutes.

Defendant was found guilty, but not guilty by reason of insanity, of (1) two counts of false imprisonment by violence (§ 236); (2) two counts of assault with a firearm (§ 245, subd. (a)(2)); (3) second degree commercial burglary (§ 459); (4) one count of obstructing or resisting an executive officer (§ 69); and (5) one count of willfully discharging a firearm (§ 246.3, subd. (a)).

Defendant was admitted into Patton, in an inpatient program, in December 2000. In April 2006, defendant was granted outpatient status, and released under the supervision of the San Bernardino/Riverside Conditional Release Program (CONREP). In April 2009, defendant began showing signs of "psychiatric decompensation, including paranoid and ruminating thoughts." On April 24, defendant's urine test reflected she had been drinking alcohol, which violated the terms and conditions of her release. An unannounced home visit revealed an open container of alcohol in defendant's home and unopened containers of alcohol outside her apartment window.

Defendant missed a CONREP appointment in May 2009. Defendant called her therapist and said she went AWOL from the program in order to seek medical attention

for the "'botched'" vaginal surgery. Defendant traveled to Oregon "in search of a clinic to perform her desired CT-scan"—a vaginal arteriogram. While in Oregon, defendant hit or attempted to hit her ex-boyfriend's girlfriend with a vehicle. Defendant was charged with recklessly endangering another person and was extradited back to California for absconding from CONREP. Defendant was again admitted to Patton, on an inpatient basis, on June 6, 2009.

B.    2011 OUTPATIENT ORDER

On December 14, 2011, the trial court ordered defendant be immediately released to CONREP on outpatient status. The trial court found defendant "met her burden of showing that she does not pose a danger to the health and safety of others due to her mental defect/disease or disorder while under supervision and treatment in the community." The trial court ordered CONREP to "provide the court with a report indicating which placement is the best suit[ed] for [defendant]."

C.    CONREP PLACEMENT REPORT

CONREP submitted its report to the trial court on January 27, 2012. The report reflected defendant was evaluated at Patton, by a clinical therapist, on January 9. In the report, CONREP wrote that, per the court's order, it would seek to place defendant "in a Statewide Transitional Regional Program (STRP), such as Southpoint, Northstar, or Gateways." However, CONREP warned that "[d]ue to [defendant's] continued symptomology, it is anticipated that it may be difficult to place [defendant] and this process may take several months."

4

CONREP noted that it had "serious misgivings about [defendant's] ability to be safely supervised in the community," due to defendant "exhibit[ing] active symptoms of her mental illness, including paranoia, delusions, and mood instability." Defendant was difficult to supervise in Patton, displayed no insight into her mental illness, had poor judgment, and lacked a viable relapse prevention plan. Despite the misgivings, the therapist wrote, "However, given that [defendant] has been ordered into CONREP by the court, we will make every effort to place her as ordered in an expedient manner."

D.     AGENCY REPORTS

Gateways Satellite (Gateways) is a Statewide Transitional Residential Program. On April 12, 2012, defendant was interviewed by Gateways's clinical director, for possible placement in the Gateways program. Defendant initially expressed interest in being placed at Gateways. However, the clinical director "pressed [defendant] on her verbal outbursts toward staff at [Patton]," and defendant then said "she actually did not want to go to Gateways." Defendant said she heard a rumor that Gateways had a high rate of revocations, and therefore wanted to be placed in a different program. The clinical director encouraged defendant to discuss the issue with her (defendant's) attorney, and then ended the interview "in light of [defendant's] refusal."

In the report, the clinical director noted that defendant's decision to decline placement in Gateways's program precluded defendant from being placed in the program; however, the clinical director also had "clinical concerns regarding [defendant's] suitability for [the] program." The clinical director found defendant's "rigid delusions persist and impair her judgment and engagement in treatment. She

5

lacks insight into her mental illness, and even denied having one. Instead she was intent on proving that her somatic delusions are indeed real and she has been wronged by the system." The clinical director opined defendant "would benefit from a continued placement at [Patton]," and concluded defendant could not be accepted into the Gateways program "in light of the above information."

Southpoint is a Statewide Transitional Residential Program. Southpoint interviewed defendant on June 6, 2012, for possible placement in the Southpoint program. Southpoint found defendant "continues to experience the same somatic delusions that were present at the time of her original offense and at the time of her AWOL from the CONREP program in 2009," e.g., during the interview defendant yelled, "'My vagina is black! I have pictures.'" As the interview continued, it appeared defendant did not understand the dangers of having discharged a firearm in the doctor's office in 1994. Southpoint found defendant had failed to cooperate with treatment while in Patton. Due to the foregoing findings, Southpoint's clinical director wrote in the report, "I believe that the risk is too great to place her in Southpoint's intensive but less restrictive environment and that she continues to be a[] risk in general to the community. At this time, we cannot accept [defendant] for treatment in the Southpoint program."

The Northstar program reviewed defendant's medical records and the denial letters from Gateways and Southpoint. Northstar found defendant "has no insight into her mental illness, or its symptoms, and has been refusing treatment associated with her medication regimen. She also appears to lack impulse control." Northstar declined to

6

admit defendant into its program, and suggested defendant should once more be referred to Southpoint, if defendant were again granted outpatient status.

In a November 2012 report for the trial court, a staff psychiatrist from the Department of State Hospitals recommended defendant "be retained and treated" at Patton. The psychiatrist noted the three outpatient programs that evaluated defendant rejected her, and the psychiatrist also believed defendant did "not meet the criteria for outpatient treatment." The psychiatrist found defendant "remain[s] actively ill with Delusional Disorder, Somatic Type." The psychiatrist concluded, "This type of delusional thinking coupled with [defendant's] past violent behavior, her anger, and her extremely high likelihood for discontinuing her antipsychotic medication in a setting where her treatment is not mandatory supports her significantly elevated risk for violence toward others in a less supervised and structured setting."

In a December 2012 report to the trial court, CONREP requested the trial court "rescind its decision" granting defendant outpatient status. (§ 1608.) It was CONREP's opinion "that, due to a mental disorder, disease, or defect, [defendant] would represent a substantial danger to the health and safety of the community if under treatment and supervision in the community." A review of defendant's chart reflected she "was not psychiatrically stable and displayed a pattern of aggressive and unpredictable behaviors." When the clinical therapist evaluated defendant in January 2012, defendant "presented with marked delusions and paranoia." The therapist also found defendant "demonstrated poor insight, impaired judgment, and impaired reality testing."

7

E.    REVOCATION HEARING

The court held a hearing on the revocation request on December 21, 2012.  The prosecutor informed the court "it is impossible to place [defendant]."  Defendant's trial attorney, Mr. Gass (Gass), asserted the court should "order CONREP to accept her, and we'll see how she does on CONREP."  Gass asserted the agencies' disagreement with the trial court's findings and order "doesn't mean the People get another shot at it."  Gass asserted defendant was "still ready to go" into an outpatient program.

The court explained the reports provided additional information that the court did not have when it granted defendant outpatient status.  The court explained that if Gass submitted on the reports, without a hearing, the court would likely rescind its prior order.  Gass responded, "I don't know for sure what the problem is, and I certainly don't know for sure what the remedy is.  But I think what I would do is object to the issue being readdressed . . . .  [I]t just doesn't seem fair to make this ruling that she's ready for CONREP, and then have CONREP say, Well, we disagree with you, Judge, so why don't you change your opinion."

The trial court explained, "it's a bit more than that because there's additional information that's been gleaned from CONREP's interactions with [defendant]."  The court continued, "There are cases that are on point on this issue, and the Court does have discretion to change its ruling based on the additional information provided to it.  So, again, my question is, does she wish to have a new hearing, or does she wish to proceed today?"  Gass requested a restoration of sanity hearing, but also objected to the trial court "even reviewing the issue."

8

The court explained the hearing it could provide would focus on CONREP's request for the court to revoke its prior order (§ 1608)—it would not be a restoration of sanity hearing (§ 1026.2). The court said defendant would need to file another petition for restoration of sanity (§ 1026.2), if she wanted a restoration of sanity hearing. Gass said he would submit on the written reports, but defendant would file a new restoration of sanity petition. (§ 1026.2.)

The court explained defendant "suffers from a rather rare mental illness." In particular, the types of delusions defendant suffers may appear in only one percent of the population, and due to the rarity of the illness there are difficulties in treating her. At the prior hearing, it had appeared to the trial court that Patton's general treatment modality and CONREP requirements "would not necessarily fit with [defendant] and her mental illness such that if that typical standard were always applied to [defendant], she would never have an opportunity to be released into [CONREP]." The court said it still had the same concerns, but had to consider the additional information that had been provided about defendant in the year since the trial court issued its outpatient order.

The court found it "particularly troublesome" that defendant was displaying signs of paranoia, because that was "new information." The court was also concerned with defendant refusing to cooperate with medical treatment and suffering "'[p]sychotic agitation.'" Based upon the new information, the court found defendant was "no longer suitable for release into [CONREP], and, therefore, revoke[d] its prior order." (§ 1608.) The court cited the danger defendant would pose to the community if released as the major factor affecting the court's decision.

9

A.     <u>DELAY IN PLACEMENT</u>

Defendant contends CONREP and the three outpatient agencies acted unlawfully by failing to place defendant in a program within 21 days of the court's outpatient order. (§ 1026.2, subd. (h).)  Defendant asserts she was prejudiced by the failure because she was denied "an opportunity to prove herself in a noninstitutional setting."  We are not a trial court and cannot issue a ruling that CONREP and the agencies acted wrongfully. We cannot issue findings based upon evidence—that is the trial court's domain.  (See *People v. Romero* (1994) 8 Cal.4th 728, 740 ["appellate courts are ill-suited to conduct evidentiary hearings"].)  Accordingly, we will interpret defendant's contention as asserting (1) the trial court erred by impliedly finding good cause existed to not place defendant in an outpatient program within 21 days; and (2) the trial court erred by allowing CONREP and the agencies to have approximately seven months to conduct the placement process.

We address the good cause issue.  Section 1026.2, subdivision (h), provides, in part, "If the court determines that the person should be transferred to an appropriate forensic conditional release program, the community program director or a designee shall make the necessary placement arrangements, and, within 21 days after receiving notice of the court finding, the person shall be placed in the community in accordance with the treatment and supervision plan, *unless good cause for not doing so is made known to the court*."  (Italics added.)  We apply the abuse of discretion standard to a

good cause finding. (*People v. Fernandez* (1999) 70 Cal.App.4th 117, 128, fn. 7 ["findings regarding good cause are generally reviewed for abuse of discretion"].)

The court entered defendant's outpatient order on December 14, 2011. In the order, the trial court ordered CONREP "to provide the court with a report indicating which placement is best suit[ed] for [defendant]." CONREP interviewed defendant on January 9, 2012. CONREP submitted a report to the trial court on January 27, 2012. In the report, CONREP informed the trial court it had "serious misgivings about [defendant's] ability to be safely supervised in the community," and "that it may be difficult to place [defendant] and this process may take several months." Gateways interviewed defendant on April 12. Southpoint interviewed defendant on June 6. Northstar submitted its letter concerning defendant in July. All three programs rejected defendant.

Given that CONREP informed the trial court that it may take "several months" to place defendant, and the letters from the different programs support CONREP's reasoning regarding defendant not being suitable for outpatient treatment, we conclude the trial court was within the bounds of reason by impliedly finding good cause existed for the delay in placing defendant. The good cause finding was supported by the evidence that it was difficult to place defendant, and while attempts were being made within a reasonable timeframe, none of the attempts were successful. In sum, we conclude the trial court did not err.

11

Next, we address whether the trial court erred by permitting CONREP and the agencies to have approximately seven months to conduct the placement process. As set forth *ante*, section 1026.2, subdivision (h), requires a defendant to be moved to an outpatient program within 21 days of notice of the court's finding, unless good cause can be shown for a delay. In this case, CONREP informed the trial court "that it may be difficult to place [defendant] and this process may take several months."

When the court received notice that the process would take "several months," the trial court should have set a status hearing in the case. A status hearing would have allowed the trial court to inquire into CONREP's and the agencies' progress and determine whether good cause still existed after the "several months" had passed. We conclude the trial court erred by not setting a status conference because "several months" became approximately seven months. A status hearing could have potentially caused the process to proceed in a timelier manner.

Nevertheless, we conclude the error was harmless. As explained *ante*, the three agencies were unwilling to accept defendant. There is nothing indicating that, if a status hearing had taken place in April, then defendant would have been more likely to be placed. Defendant may have had a more expedient resolution, but it appears the resolution would have been the same. We note the trial court offered to have a hearing on this issue, as to whether CONREP's report, which included reasons for defendant not being placed, was well-founded, but Gass submitted on the report. Therefore, we must conclude CONREP's reasons were properly supported. Since we conclude the result would be the same, we conclude the error was harmless under both the *Chapman* and

12

*Watson* standards.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonably probable a different result would occur].)

B.    <u>STATUTES</u>

Defendant asserts the statutory scheme does not provide for revocation of outpatient status when the defendant has not actually been placed in an outpatient program.

"'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.]  The plain meaning controls if there is no ambiguity in the statutory language.  [Citation.]  If, however, 'the statutory language may reasonably be given more than one interpretation, ""courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute."'" [Citation.]"  (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

Section 1608 provides, in relevant part, "If at any time during the outpatient period, the outpatient treatment supervisor is of the opinion that the person requires extended inpatient treatment or refuses to accept further outpatient treatment and supervision, the community program director shall notify the superior court in either the

county which approved outpatient status or in the county where outpatient treatment is being provided of such opinion by means of a written request for revocation of outpatient status."

Defendant asserts the relevant portion of the statute is "any time during the outpatient period." Defendant contends this language reflects a revocation cannot occur unless a patient has been in an outpatient program. In other words, defendant asserts outpatient status cannot be revoked while a defendant is still an inpatient.

As set forth *ante*, we apply the words' plain meaning. The words "at any time during the outpatient period" are broad due to the words "any time." The words are not narrow, as defendant is presenting them. "Any time" can be understood to be synonymous with "any stage." So at "any stage" or "any time" in the outpatient period, revocation can occur. Defendant's case was at the placement stage of the outpatient period. The court had ordered defendant to have outpatient status, thus beginning the "outpatient period," and CONREP was in the process of finding defendant a placement. Again, the words of the statute are broad, not limiting. By using the words "any time," the Legislature allowed a revocation request to be made at any time in the outpatient process. In this case, the revocation request was made during the placement stage. The statutory language does not bar revocation at the placement stage of the outpatient period. Accordingly, we conclude the trial court did not err.

Defendant relies on *People v. Dobson* (2008) 161 Cal.App.4th 1422, to support her contention. In particular, defendant relies on the following language from the case, "While in the outpatient program, the applicant may be returned to the state facility after

a hearing if determined dangerous to others while in the program." (*Id.* at p. 1433.)

Defendant emphasizes the language "[w]hile in the outpatient program," to make the point that a defendant must be placed in an outpatient program before having outpatient status revoked.

We disagree with defendant's use of *Dobson* to limit the language of section 1608. As set forth *ante*, section 1608 employs the language "at any time." Therefore, *Dobson* is correct that revocation may occur when a defendant is in an outpatient program. However, that is not the only stage at which revocation may occur. Notably, the *statute* does not use the language "while in the outpatient program," the statute uses the language "at any time during the outpatient period." Thus, a defendant need not be in an outpatient program prior to outpatient status being revoked. Rather, the outpatient period begins with the court's outpatient order. Therefore, revocation can occur at the placement stage, as it did here, or in the program stage, as it did in *Dobson*.

C.      COLLATERAL ESTOPPEL AND RES JUDICATA

Defendant contends principles of collateral estoppel and res judicata require the outpatient order be accepted as "law of the case."[2] Defendant asserts the law requires

---

[2] "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular.' [Citations.]" (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892-893.) The trial court's outpatient order and revocation order do not fall within the law of the case doctrine, since the law of the case doctrine is triggered by an appellate court opinion. Accordingly, we will not further discuss "law of the case."

there be "material changes" in a defendant's mental condition in order for an outpatient order to be revoked.  Defendant asserts her condition at the time of the revocation was essentially the same as her condition at the time the outpatient order was entered, except for a single incident of paranoia.  Therefore, defendant asserts the trial court was rehearing the same issue with essentially unchanged evidence.

Collateral estoppel can operate to "preclude a party to prior litigation from redisputing issues therein decided against him."  (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828.)  As set forth *ante*, section 1608 permits the outpatient treatment supervisor to request revocation of an outpatient order "at any time" the supervisor believes a defendant needs "extended inpatient treatment or refuses to accept further outpatient treatment and supervision."

The same issue was not being relitigated.  At the restoration of sanity hearing, in 2011, the issue was whether defendant "would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community."  (§ 1026.2, subd. (e).)  At the revocation hearing, in 2012, the issue was defendant's current (2012) mental state.  In particular, whether there was "evidence of a change of circumstances, i.e., that despite the fact [defendant] did not possess the requisite dangerousness in the earlier proceeding, the circumstances have materially changed so that . . . she now possesses that characteristic."  (*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1060.)

Approximately one year had elapsed from the time the trial court entered its outpatient order to the time the trial court revoked the order. During that year, three outpatient programs rejected defendant, defendant refused to cooperate with her medical treatment, defendant experienced paranoia, and defendant required a PRN/sedative to calm her psychotic agitation. Thus, the issue at the revocation hearing was whether the outpatient treatment supervisor was correct in concluding defendant now needed extended inpatient treatment based upon the new evidence of defendant's condition. The issue was not the same as the prior hearing, a year earlier—the revocation hearing required consideration of defendant's current condition based upon evidence gathered during the year between the two hearings. Accordingly, since the hearings involved different issues, we conclude the revocation order is not barred by principles of collateral estoppel.

D.    SUBSTANTIAL EVIDENCE

In defendant's Appellant's Reply Brief, she raises a substantial evidence issue. Defendant asserts the finding of a material change in her condition is not supported by substantial evidence. Although the issue was improperly raised for the first time in the reply brief, we will briefly address this issue. (See *People v. Senior* (1995) 33 Cal.App.4th 531, 537 [an argument raised for the first time in a reply brief is waived].)

In a substantial evidence review, we "'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v.*

17

*Ugalino* (2009) 174 Cal.App.4th 1060, 1064.)  At the revocation hearing, the issue is whether there has been "a change of circumstances, i.e., that despite the fact the [defendant] did not possess the requisite dangerousness in the earlier proceeding, the circumstances have materially changed so that [s]he now possesses that characteristic." (*Turner v. Superior Court*, *supra*, 105 Cal.App.4th at p. 1060.)

At the outset, we note that defendant submitted on the reports at the hearing. Defendant's trial counsel said, "I'll submit that issue [(the revocation)] on the written reports rather than taking live testimony."  The revocation hearing took place on December 21, 2012.  A December 11, 2012, report from CONREP reflected defendant was rejected from three outpatient programs.  The report also reflected that on August 31, 2012, defendant was given a PRN for "'psychotic agitation'" after a verbal altercation with her roommate.  On June 28, 2012, defendant expressed concern that a janitor put something in her shoes to give her a foot fungus—displaying paranoia. Additionally, defendant had "been talking about being in a 'spiritual warfare.'"

At the prior hearing—the restoration of sanity hearing in December 2011—Dr. Patel of Patton testified defendant had been "violence-free in the hospital" and described defendant as "very respectful."  Dr. Patel also described defendant as suffering from delusional disorder; he did not say she was suffering from paranoia.

In sum, the evidence at the revocation hearing (December 2012) reflected that during the year between the hearings, defendant suffered from paranoia and was becoming more agitated—needing PRN assistance to calm down—thus reflecting material changes in defendant's condition.  The trial court cited defendant's paranoia

18

and her psychotic agitation when finding defendant now posed a danger to the community—findings that were supported by the foregoing evidence. Given the information in the reports, and the testimony from the 2011 hearing, substantial evidence supports a finding of a material change in defendant's condition.

We note that while it does not appear testimony was given at the 2011 hearing regarding paranoia, there is evidence that defendant suffered from paranoia prior to 2012: (1) CONREP's December 2012 report reflects defendant suffered paranoid thoughts in April 2009, during her first outpatient release; (2) the Department of State Hospitals' November 2012 report reflected that, at some point, defendant had been diagnosed with Schizophrenia, Paranoid Type, among other illnesses; and (3) CONREP's January 2012 report reflects defendant suffered paranoia— presumably defendant was suffering paranoia in 2011, since CONREP interviewed defendant on January 9, 2012 (very early in the year) for the January 2012 report.

The foregoing three reports were issued *after* the trial court entered its December 2011 order granting outpatient status. Also, as set forth *ante*, when Dr. Patel testified about defendant's illness in 2011, he did not mention paranoia. Therefore, while defendant may have suffered paranoia prior to 2012, in this record it was not revealed that she suffered paranoia until the hearing in December 2012, when the three reports revealed the symptom/illness. Accordingly, for purposes of the trial court's findings, defendant's paranoia was new, i.e., a material change.

19

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

MILLER
                                                                J.

We concur:

HOLLENHORST
                    Acting P. J.


KING
                            J.