Filed 4/8/16  P. v. Stockman CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GREGORY CHATTEN STOCKMAN,<br><br>        Defendant and Appellant. | A143735<br><br>(Sonoma County<br>Super. Ct. No. SCR20626) |

In 1993, defendant Gregory Chatten Stockman was charged with attempted murder and assault with a deadly weapon.  (Pen. Code, §§ 187 subd. (a), 664, 245, subd. (a)(1).)[1]  He was found not guilty by reason of insanity and committed to Napa State Hospital.  Defendant appeals from an order denying him conditional release under section 1026.2 to a supervised outpatient program.  His counsel has submitted an opening brief indicating he has reviewed the record and found no arguable issues to be pursued on appeal.  (See *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544.)  The brief provides a narrative of the facts relevant to the pertinent legal issues.  Counsel provided defendant with a copy of this brief and informed him of the right to file a supplemental brief.  Defendant has done so.  While it would be appropriate under *Ben C.* to dismiss the appeal, we have reviewed the record and affirm the order of the trial court.  (*Ibid.*; *People v. Dobson* (2008) 161 Cal.App.4th 1422, 1436, 1438–1439.)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

## BACKGROUND[2]

"This appeal is the latest in a series of disputes concerning defendant's treatment and rehabilitation.

"Defendant has been diagnosed with Bipolar I Disorder, alcohol dependence, and Personality Disorder Not Otherwise Specified. On two occasions, from 2001–2003 and from 2004–2006, the state hospital authorized his conditional release on an outpatient basis.

"In 2006, the trial court revoked outpatient status because there was substantial evidence he needed inpatient treatment or had refused outpatient treatment and supervision. We affirmed this order in 2008 in a nonpublished opinion. (*People v. Stockman* (July 18, 2008, A117559).) As a result of the revocation order, the trial court ruled defendant was ineligible for a final-phase restoration-of-sanity trial. We also affirmed this order. (*People v. Stockman* (Nov. 25, 2008, A120518) [nonpub. opn.].)

"Recognizing that he needed to regain outpatient status as the first step in the restoration-of-sanity process, defendant, in 2009, sought outpatient status by application under section 1026.2. The trial court denied this application, crediting expert testimony defendant would be dangerous to others if released, because he had shown an unwillingness to comply with essential requirements of his treatment plan and was guarded and non-communicative with his treatment team. We concluded the court's findings were supported by substantial evidence, and affirmed in 2010 in a nonpublished opinion. (*People v. Stockman* (Oct. 22, 2010, A126735).)

"Section 1026.2 allows successive applications for outpatient release or restoration of sanity, so long as the defendant waits a year after each denial. (§ 1026.2, subd. (j).) Defendant filed a new application on July 11, 2012.

---

[2] We take judicial notice of our prior, unpublished opinion in *People v. Stockman*, No. A137286, and quote from it in reciting the background of the case.

"The trial court requested a current report from Napa State Hospital, which defendant submitted with his court filings.  (See § 1026.2, subd. (*l*) [when application for outpatient release is by defendant, 'no action on the application shall be taken by the court without first obtaining the written recommendation of the medical director of the state hospital or other treatment facility']; see also *People v. Sword* (1994) 29 Cal.App.4th 614, 635–636 [court may consider medical records of committee, despite hearsay concerns].)  According to the report, defendant 'should be retained for treatment, as he has a severe mental illness, continues to be a danger to others, and therefore cannot be treated in a lower level of care or a less secure facility at this time.'

"Although the report noted no incidents of verbal or behavioral aggression and no major relapse since defendant's initial offense, and also noted other positive developments (such as defendant having previously held a job at the hospital and defendant's new willingness to share information about his financial transactions), the report also catalogued a number of concerns.  For instance, defendant, despite medication, exhibits some residual symptoms of his disorder, including 'paranoia and some obsessive qualities'; defendant's most recent doctor, Dr. Sachdeb, found defendant had poor judgment and an unwillingness to follow his treatment plan; defendant was not compliant with conditions when previously an outpatient and he presently was refusing to meet with certain staff who handle the outpatient release program; and defendant was recently relocated from an 'open unit' to a 'closed' or 'locked' unit after refusing to take Abilify, which had been prescribed (in addition to the Lithium he was already taking for the bipolar disorder) to reduce the 'paranoid symptoms related to his mental illness that lead him to be excessively guarded and interfere with his treatment.'  According to the report, his unwillingness to cooperate in his treatment, as most seriously and recently evidenced by his refusal to take Abilify, indicates 'he may not cooperate with his treatment team if he is placed in community supervision.'  His 'excessive guardedness creates uncertainty that he will openly share symptoms with his team, making it harder to

3

ensure they will be able to provide the optimal treatment to prevent future decompensation and the much higher risk level that such a decompensation would entail.' Further, the treatment team views defendant's unwillingness to cooperate as a risk factor for dangerous behavior.

"The court held a hearing on defendant's section 1026.2 application over three days in November 2012. Five witnesses testified. . . .

"[¶] . . . [¶] At the end of the third hearing day, the trial court ruled from the bench. First, it believed the conditional release hearing had been premature and unnecessary because a prerequisite under section 1603 was absent: the state hospital did not support defendant's conditional release. Second, the trial court found defendant's conditional release would endanger the community." (*People v. Stockman* (Mar. 28, 2014, A137286) [nonpub. opn.].)

Defendant filed the petition for transfer to outpatient treatment now before us in propria persona in July 2014. After counsel was appointed, the matter was continued a number of times, and trial before the court commenced November 24, 2014. Defendant called four witnesses.

Gardner Carlson, a senior psychiatric technician, testified defendant had been successfully participating in the vocational program doing clerical work for about nine months. Carlson was not aware of any negative interactions, but admitted he would not necessarily be apprised of an incident unless it were serious. Carlson, who essentially had an administrative role with the program, was not involved with defendant's treatment, although he can provide information to the treatment team. He had done so once with respect to defendant, and at that time indicated defendant was participating well.

Robert Ingham, a teacher at Napa State Hospital, testified about defendant's teacher support work. Defendant had been working at the teaching facility about eight months. He prepares teaching materials and is successfully interacting with both staff

4

and students (other patients of the facility). Ingham is not aware of any negative interactions. Ingham is not part of defendant's treatment team, and has not been asked to provide any input to the team about defendant's work.

Deborah West, also a teacher at Napa State Hospital and defendant's supervisor, similarly testified about his work at the educational site. She testified he performs his support tasks very well, including taking the initiative when there is not a specific task already assigned. West provides a monthly evaluation of his performance to defendant's treatment team, but does not provide input into his treatment.

Dr. Sandy Folker, a clinical psychologist at Napa State Hospital, testified about defendant's treatment. As of the time she testified, she had been treating defendant for approximately four months.[3] Defendant was participating in relapse prevention therapy, both as to his mental condition and as to substance abuse, to prepare for potential discharge. His work experience at the teaching site was also directed to preparing him for potential discharge.

Dr. Folker discussed in some detail the progression patients make through treatment units. Patients start in admission, where acute symptoms are addressed. Once these symptoms are brought under control, patients move to the stabilization unit, which is fairly restrictive. As they show increased stability and readiness to enter the community, they move to the transition unit, where they have much more freedom of movement and more responsibility, including taking medications. Once patients demonstrate stability, they move to the discharge unit to "fine tune" their readiness for release and to work to achieve release within the following year. In the discharge unit, a patient undergoes a structured clinical interview which identifies the risk factors on which he or she needs to focus. After three to four months of focusing on these factors,

---

[3] While Folker believed she would not be testifying on the day she was, in fact, called and had she known, she would have done more preparation, she also assured the court that if she felt unable to answer questions, she would let the court know.

the patient may be recommended for a forensic quality review panel, which considers whether the patient will be recommended for release.  If so, the hospital works with the conditional release program (CONREP) to schedule a community outpatient treatment readiness interview, in which the hospital and CONREP discuss the plans for the patient's release into the community.  However, while a patient may be able to recognize all his or her risk factors and may have the tools to address them, that does not always mean the patient will be able to "actually practice them when given the opportunity."

"[I]n July" (apparently about five months before the hearing), defendant had returned to the stabilization unit from the discharge unit, due to paranoia symptoms and refusal to take his medications.  However, his current treatment team, including Dr. Folker, has not seen further symptoms of psychosis or paranoia, and the month prior to the hearing, the team recommended that defendant return to the discharge unit, bypassing the transition unit.  The treatment team feels defendant has the tools and resources to move directly back to the discharge unit and wants to provide him the opportunity to live in a less restricted setting and show he is ready for release.  However, getting along with people is a risk factor he will need to work on during this period in the discharge unit.  Dr. Folker observed that the current treatment team, as it has had more opportunity to work with and observe defendant, has seen that "he tends to have very rigid thinking," and can "become disagreeable, very argumentative, and have difficulty considering other people's opinions."

Dr. Folker also acknowledged defendant has previously been released to CONREP, but had issues with the outpatient supervisor concerning keeping CONREP informed of his whereabouts and consulting with them about any financial agreement over $500.  Interpersonal conflict had been identified as one of defendant's risk factors and was CONREP's reason for removing defendant from the program and returning him to the hospital.  Dr. Folker commented difficulty with interpersonal relationships has

6

been one of the factors that has "caused difficulty for" defendant and has "been holding him back and preventing him from release."

Dr. Folker, herself, did not have a strong opinion as to whether defendant would currently be a risk to the community while under supervision. This is a matter for the discharge unit and for defendant's treating psychiatrist.

The prosecution called no witnesses, maintaining defendant had not carried his burden to demonstrate he was entitled to immediate release to community supervision.

The trial court ruled from the bench. It acknowledged the testimony of Carlson, Ingham and West, all of whom have interacted with defendant and provided "very positive feedback" as to his teacher support work. Dr. Folker was also familiar with defendant's work and, like the other witnesses, was not aware of any incidents of physical violence while she has been part of his treatment team. She was not able, however, to provide an opinion whether defendant would pose a danger to the community as an outpatient. She explained only that he met the criteria for transfer to the discharge unit for further work in moving toward release to CONREP. The court concluded this was insufficient evidence to conclude defendant would pose no danger to the community as an outpatient, noting Dr. Folker's testimony that interpersonal conflicts remained a risk factor.

## DISCUSSION

"A person committed to a state hospital or other treatment facility under the provisions of Section 1026 shall be released from the state hospital or other treatment facility only under one or more of the following circumstances: [¶] (a) Pursuant to the provisions of Section 1026.2. [¶] (b) Upon expiration of the maximum term of commitment as provided in subdivision (a) of Section 1026.5, except as such term may be extended under the provisions of subdivision (b) of Section 1026.5. [¶] (c) As otherwise expressly provided in Title 15 (commencing with Section 1600) of Part 2." (§ 1026.1.) "In this case, the only issue relates to the first option . . . whether defendant

7

should be released pursuant to the provisions of section 1026.2." (*People v. Soiu* (2003) 106 Cal.App.4th 1191, 1195–1196 (*Soiu*).)

Section 1026.2, in turn, allows a defendant (or his treatment facility director or his outpatient program director) to submit an application for release based on restoration of sanity. (§ 1026.2, subd. (a).)[4] "Section 1026.2 involves what has been described as a two-step process. [Citations.] The first step in the release process requires the defendant, who has filed a release application, to demonstrate at a hearing that he or she will not 'be a danger to the health and safety of others, due to mental defect, disease, or disorder, [if] under supervision and treatment in the community.' (§ 1026.2, subd[.] (e).)[5] If the court finds such at the hearing, the defendant is then placed in 'an appropriate forensic conditional release program for one year.' (§ 1026.2, subd[.] (e).) This is commonly

---

[4] Section 1026.2, subdivision (a), provides: "An application for the release of a person who has been committed to a state hospital or other treatment facility, as provided in Section 1026, upon the ground that sanity has been restored, may be made to the superior court of the county from which the commitment was made, either by the person, or by the medical director of the state hospital or other treatment facility to which the person is committed or by the community program director where the person is on outpatient status . . . ."

[5] Section 1026.2, subdivision (e), provides: "The court shall hold a hearing to determine whether the person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community. If the court at the hearing determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, the court shall order the applicant placed with an appropriate forensic conditional release program for one year. All or a substantial portion of the program shall include outpatient supervision and treatment. The court shall retain jurisdiction. The court at the end of the one year, shall have a trial to determine if sanity has been restored, which means the applicant is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder. The court shall not determine whether the applicant has been restored to sanity until the applicant has completed the one year in the appropriate forensic conditional release program, unless the community program director sooner makes a recommendation for restoration of sanity and unconditional release as described in subdivision (h). The court shall notify the persons required to be notified in subdivision (a) of the hearing date."

8

called the outpatient placement hearing." (*Soiu*, *supra*, 106 Cal.App.4th at p. 1196, italics omitted.) "The second step in the release process, often referred to as the restoration of sanity trial, normally occurs one year after the defendant has been placed in an outpatient program." (*Ibid.*) "Unlike during the first step in the proceedings, the restoration of sanity trial requires the defendant to demonstrate that he or she is no longer a danger to the health and safety of others under all circumstances." (*Ibid.*)

Section 1026.2 specifies the trial court "shall" grant outpatient status if it "determines the applicant will not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subd. (e).) A defendant seeking outpatient status has the burden of proving this standard has been met by a preponderance of the evidence. (*People v. Sword, supra,* 29 Cal.App.4th at p. 624.) Appellate review of the denial of a section 1026.2 petition is for abuse of discretion (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900; *People v. Dobson, supra,* 161 Cal.App.4th at pp. 1433–1434), although this includes determining whether any factual findings are supported by substantial evidence (see *People v. Parker* (2014) 231 Cal.App.4th 1423, 1435 [substantial evidence standard applied to finding that material change in the defendant's conduct warranted removal from CONREP and return to state hospital].)

The trial court did not abuse its discretion in determining that defendant did not carry his burden of proof. While defendant presented evidence he has performed well in his work providing teacher support services and has not had any negative interpersonal interactions in that setting, he did not provide the court with medical evidence that compelled the court to find he would "not be a danger to the health and safety of others, due to mental defect, disease, or disorder, while under supervision and treatment in the community, in an outpatient setting." The only medical evidence defendant presented was the testimony of Dr. Folker. While Dr. Folker testified defendant met the criteria for placement in the discharge unit, she also testified defendant had previously progressed

through the discharge unit to CONREP, but had been removed from the community program and returned to the stabilization unit and had just been approved for transfer back to discharge unit.  Dr. Folker further explained the discharge unit is an important step in the process of returning to the community setting and entails a detailed focus on risk factors.  She also opined defendant will need to focus on the risk factor of interpersonal relationships, which has been a challenge for him.[6]

## DISPOSITION

The order denying conditional release as an outpatient is affirmed.

---

[6] The only medical report in the trial court record, prepared by Dr. Samuelson and dated August 4, 2014, and to which Dr. Folker referred several times, was not offered into evidence during the hearing.  Nor did the trial court make any reference to this report in its ruling.  While the parties initially believed an updated report would be prepared by a Dr. Adams, no such report was filed with the court by the time the witnesses finished testifying.  After speaking with Dr. Adams, defense counsel chose not to ask for a further continuance of the hearing and submitted on the evidence presented.

_____
Banke, J.

We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.

11