Filed 3/21/25  P. v. Holaday CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KYLE HOLADAY,<br><br>    Defendant and Appellant. | F086926<br><br>(Super. Ct. No. F17901801)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Michael G. Idiart, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberly A. Donohue, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Kyle Holaday was charged with one count of murder, four counts of attempted murder, and one count of animal cruelty, all with firearm enhancements.  He

was found not guilty by reason of insanity (NGI) and committed to the Department of State Hospitals (DSH) for mental health treatment. In 2023, Holaday petitioned the trial court to be released from the hospital and placed under community supervision on an outpatient basis in a conditional release program (CONREP), as part of the process for restoration of his sanity pursuant to Penal Code section 1026.2.[1] After conducting an evidentiary hearing, the trial court denied the petition. Holaday appeals from that order, arguing that substantial evidence does not support the trial court's determination. We disagree and affirm the trial court's order.

## PROCEDURAL HISTORY

In an information filed on March 16, 2018, Holaday was charged with murder (§ 187, subd. (a); count 1), with four counts of attempted murder (§§ 664/187, subd. (a); counts 2, 3, 4, & 5); and one count of cruelty to an animal (§ 597, subd. (a); count 6). As to counts 1 through 5, it was further alleged Holaday personally and intentionally discharged a firearm which proximately caused great harm or death (§ 12022.53, subd. (d)), and as to count 6, that Holaday personally used a firearm (§ 12022.5, subd. (a)).

In October 2019, the trial court found Holaday NGI on all counts and allegations. On November 20, 2019, the trial court committed him to the custody of the DSH for a maximum commitment term of 12 years determinate followed by 115 years to life indeterminate.

In January 2023, Holaday, who was placed at Atascadero State Hospital (DSH-A), filed a petition for outpatient treatment pursuant to section 1026.2. The petition was denied on September 19, 2023. This appeal followed.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

2.

**STATEMENT OF FACTS**

*Commitment Offense*

The facts of the commitment offense are taken from the probation report. On the evening of March 24, 2017, deputies responded to a report regarding an assault. When they arrived, they heard screaming coming from inside a home, where they found a male subject, age 60, (later determined to be Holaday's stepfather) lying face up on the kitchen floor in a pool of blood. He was determined to be deceased. In the living room of the residence, deputies found a deceased dog. They also found an adult female, age 28, holding a five-month-old infant. The woman stated both she and the infant had been shot. Two other females, ages 34 and 57, were found, also both shot. According to one of the women, who was Holaday's mother, Holaday was watching television with the rest of them when he left the room and returned a few moments later with a gun and began firing. Holaday's behavior prior to the shooting did not seem out of the ordinary and there was no confrontation leading to the incident. Holaday had served in the military and his mother believed he suffered from post-traumatic stress disorder (PTSD). Holaday fled the scene and was later found unconscious after he was struck by a vehicle. A handgun was found four feet from him. Holaday was taken to the hospital, and later claimed he had no recollection of the shootings.

*Assessment Report*

On January 25, 2023, the trial court ordered the medical director of the DSH and CONREP to prepare a summary and/or recommendation regarding Holaday's eligibility for outpatient status and/or designate a facility for housing pending a hearing on his petition.

On January 30, 2023, the medical director of DSH-A filed a summary of Holaday's treatment and medications, stating Holaday was taking no controlled medications, had no special needs requiring specialty or nursing care, was at low risk of

3.

institutional violence, escape and suicide, and was enrolled in various programs and weekly one-on-one therapy with a psychiatrist.

On February 23, 2023, CONREP filed its report, chronicling Holaday's social, medical, substance abuse, criminal and dangerous behavior, and psychiatric history, and concluded that Holaday could not be safely and effectively treated in the community at that time. Holaday's social history, as reported in May of 2018, noted that his biological father committed suicide in 2013, reportedly shooting himself in the head while on the phone with Holaday. Holaday's family history included a mother with depression, a paternal uncle with ADHD, a father with a history of alcoholism, a paternal grandfather with a history of delusions, a great aunt reported to have bipolar disorder, and that Holaday had suffered a traumatic brain injury in 2012. Reports from 2018 and 2022 note Holaday's extensive history of alcohol and marijuana use, as well as some other drug experimentation. In 2018, Holaday reported that he shot a peer in middle school with a BB gun, punched another and smashed his head into concrete and cut his neck with a knife. He destroyed other people's items and was suspended from school. Holaday was described by others as paranoid and interested in conspiracy theories, and he described experiencing episodes of auditory hallucinations around 2012, after returning from military service in Afghanistan in 2011, where he experienced instances of a friend being shot in the face and his platoon sergeant being shot in the head. He contemplated suicide in 2015 or 2016 and sought help at the Veteran's Administration.

On April 6, 2023, the DSH filed its section 1026.2, subdivision (*l*) court report, written by forensic psychologist Dr. Giordano, recommending that it was of the opinion Holaday continued to have "a mental defect, disease, or disorder and would be a danger to the health and safety of others, even while under supervision and treatment in the community." Specifically, the DSH opined Holaday posed a risk of dangerousness linked to components of his PTSD as well as his overall personality structure. The report stated that Holaday's PTSD symptoms had decreased in prominence after his arrest and

4.

incarceration "likely due to the highly structured environment of both county jail and DSH-A, which is similar to the increased structure of the military; however, he has continued to endorse intrusion (i.e., nightmares, distress related to cues of his trauma) and avoidance symptoms as well as alterations in cognition (i.e., self-blame, memory difficulties) and arousal (i.e., exaggerated startle response, sleep difficulties) over the past several months. Available treatment records also corroborate Mr. Holaday's continued avoidance of processing his trauma specifically related to the instant offense; as well as his associated guilt and shame. As mentioned, the severity of his symptoms and associated distress is likely mitigated by his placement at DSH-A, where he is not exposed to a number of the identified triggers to his symptoms (i.e., large crowds, weapons, the setting of the instant offense); however, given his history and ongoing symptoms, it is the opinion of this writer, that a diagnosis of PTSD remains appropriate for Mr. Holaday."

The report also opined that Holaday still met the criteria for antisocial personality disorder, "as evidenced [by] a pervasive pattern of disregard for or violation of the rights of others since the age of 15," as well as alcohol-use disorder.

_Holaday's Testimony at the Petition Hearing_

Holaday testified at the September 18, 2023, hearing that he was currently residing at DSH-A, where he took various classes: AA/NA meetings, "SMART recovery," yoga, cycling, weightlifting and band. Holaday acknowledged that CONREP had not done enough eye movement desensitization and reprocessing (EMDR) therapy; he had done three or four sessions of EMDR, but the clinical psychologist did not think it was necessary to continue. Holaday was willing to start those treatments again if requested of him. Holaday explained that DSH-A wanted him to try the treatments with a different doctor, which he requested on several occasions, but it was not provided.

Holaday testified that he had no recollection of the shooting incidents, but he had not been sleeping well the day of. He testified that he had taken steps to understand his

drinking and violence triggers, as he did not want to end up like his father, who committed suicide.

Holiday testified that, if he was placed in CONREP, he would slowly expose himself to going home, the scene of his crimes. He did have the financial ability from his military disability to rent an apartment and independently take care of himself.

Holaday alleged that many of his treatments had not been accessible during COVID, but he was again able to start substance abuse and trauma treatment, to work on his coping skills, and meet with his clinicians.

Holaday testified that, while he did not remember events during the offenses, he did understand the impact of his actions and had spent years reflecting on that. To avoid future violence, he opined he would be able to see the warning signs, use the VA more in the future, and would not become complacent or have firearms around. Prior to the incident, Holaday testified he had been prescribed Ambien, Ritalin and Adderall for his PTSD, which he later learned should not be taken for his condition.

Holaday testified to his understanding about how CONREP works — the first month was a blackout period, without outside communication while getting situated with funds, housing, and treatment; at some point, he would be able to go into the community, to school and to a job; he would be required to drug test weekly, be subject to search, participate in weekly therapy, and have an imposed curfew; and he would be required to report any interaction with law enforcement to CONREP. Holaday's goal was to go to school to become a counselor, while working in the meantime, and he planned to attend PTSD and veteran-specific groups.

Holaday acknowledged that one doctor had diagnosed him as having an antisocial personality disorder, but that person only met with him three or four times and concluded, based on a statement by Holaday's mother, that he lacked empathy. No one else had been concerned with his continuing criminal activity or supposed lack of empathy. He agreed

that he had been diagnosed with attention deficit hyperactivity disorder (ADHD) when he was a child, but was never diagnosed with conduct disorder as a child.

Holaday described the five levels of treatment at DSH-A: level 1, where the patient is escorted everywhere; level 2, giving the patient minimum access to various things; level 3, allowing the patient to go off his unit; and level 4, the highest level before being accepted into CONREP. Holaday claimed to have been on level 4 for over three years, he had had a job as a custodian without any issues with his supervisor and, while he had been assaulted at DSH-A three times, he never reacted violently.

Holaday testified that, if he were released from DSH-A, he would not have any thoughts about hurting himself, he would not have a weapon again, he would never go into a bar or get drunk, and he had no desire to drink with his friends. Holaday testified that he spent a lot of time making a wellness recovery plan and relapse prevention plan. Given the opportunity in CONREP, he testified he would not be back at DSH-A again, as he had come a long way and gained a lot of wisdom over the seven years he had been there. He was now 33 years old and understood the signs when heading in the wrong direction and the need to seek help.

On cross-examination, Holaday was asked about the signs of needing help and asking for it. According to Holaday, prior to the shootings, he isolated himself and did not want to leave the house because he was paranoid. After he got out of the Army, he returned to his family residence, but the neighborhood had changed and there were "bad people" and people using drugs. He reiterated that he did not remember the actual shooting and was not sure why he did it, but remembered prior to the shooting sitting in his parents' home and people arriving for dinner. He remembered the individuals who were there, including the baby. He had hoped just to go to sleep and not socialize with anyone.

Holaday testified to frustration with not being able to move forward in his life. While he had enjoyed the eight years in the Army for the "most part," there were also a

lot of bad times, including people dying. He had been deployed to Afghanistan and Iraq for one tour each, and had seen combat. Outside of combat zones, he had problems dealing with "all the bullshit," random room inspections and missing items that had been stolen, which led to frustration. His decision to leave the Army was his own and, while the Army wanted him to stay, he chose to leave because of what happened to his father and his mother being home alone.

When Holaday returned home, he had anxiety and was experiencing PTSD, which he was not willing to admit at the time. He was concerned about the people in the neighborhood doing "bad things" and assumed something bad was going to happen. He felt he had to protect his family and was trained and prepared to do so. When he returned home, his mother had a handyman on the property Holaday was concerned about, due to the person's erratic movements and drug use. This person caused Holaday stress and lack of sleep, and he planned to use his firearm if need be.

Holaday recalled that, when he was in the seventh grade, he got into trouble for making fake money, which he used to buy items from the snack bar. As a result, he was required to do community services, which he did not like and deliberately stepped on a nail to avoid doing the work.

Holaday testified that, when he returned from Afghanistan, the VA offered him group meetings, but he refused to attend, although he sought help from them for medication to help him sleep. He testified that he would now go to the VA for group sessions because he knows he needs help. Holaday acknowledged that his life would be difficult because of the trauma he faced and that he needed lifelong treatment. On redirect, he phrased the need for "treatment" as a need for ongoing therapy.

Also on redirect, Holaday testified about an incident in Afghanistan, when he shot himself. Holaday relayed that, a few weeks after a "big fire-fight," in which they "lost" some people, he was not focused on what he was doing and accidently discharged his firearm into his right hand. Holaday understood PTSD from combat was different than

8.

other forms of PTSD, as it involved seeing people close to you being harmed and killed. He thought the VA was where to seek help, as they were able to address the type of trauma he experienced.

According to Holaday, he spoke to his psychiatrist, Dr. McGee, with his social worker, and Dr. Davis about his disproportionate and hypervigilant concern with his mother's neighbor and her safety. Holaday agreed to abide by all of the CONREP rules, even when he did not agree with them.

On recross examination, Holaday agreed that he did not recognize at the time of the shooting that he was suffering from PTSD. While he could see the stressors, he did not know how to address them. He felt he now had the tools to see the signs.

The trial court questioned Holaday, who testified that, prior to the shooting, he did not have any problems with his stepfather, mother, or any of the other victims. He also explained about the classes he took at DSH-A, some of which were restricted during COVID. He acknowledged he had had a drinking problem since the age of 19, which began in the military, and agreed that the issue of substance abuse never really goes away. But he did think he was prepared to face the world outside of the DSH-A.

At the conclusion of testimony, Holaday submitted three defense exhibits — an e-mail from Dr. Michael McGee and two monthly/transfer psychiatric progress notes from Dr. McGee.

*The People's Case*

Prior to the prosecution's case, the prosecutor submitted two exhibits — a court report from Dr. Breanna Giordano and CONREP report from Dr. Sarah Mojtahedi.

Forensic psychologist, Dr. Mojtahedi, who was employed by CONREP and wrote the hospital liaison visit report requested by the court, described CONREP as a conditional release program for individuals who are either not guilty by reason of insanity, or they have been deemed to be offenders with mental illness. CONREP provides outpatient treatment in a somewhat supervised setting. In looking to see if

9.

someone is an appropriate candidate for CONREP, the patient is evaluated to see whether they have been involved in any verbal or physical altercation in the past year; how much insight they have into their mental illness and into their crime; whether they recognize their own triggers and warning signs; whether they have developed adequate coping skills to use and have a relapse prevention plan; and whether they are able to apply the things they have learned in everyday functioning.

Dr. Mojtahedi interviewed Holaday at least three times in preparation for her report and at least once after the report was prepared. In her opinion, Holaday was not ready to be released into CONREP "at this time," citing the discrepancies in the record regarding his diagnosis with PTSD, which was an original diagnosis, then removed, then reinstated, but had not been fully treated for as yet. Dr. Mojtahedi found that there was not an agreed upon treatment strategy for Holaday, and a more thorough psychological evaluation was necessary to determine such a strategy to allow for a clear treatment plan.

Dr. Mojtahedi also opined that Holaday, while in the DSH-A, was exhibiting some avoidance in discussing his crime, in learning what actually happened, and why he committed the crime, which meant he could not fully mitigate the risk to prevent such a crime again. In CONREP those facts would be discussed every day and, since he had not fleshed out that issue while in DSH-A, it was not certain how he would react when dealing with it in CONREP.

Dr. Mojtahedi did not believe Holaday fully understood his triggers. Dr. Mojtahedi was also concerned that recent records for Holaday showed an "added diagnosis," as if things were "evolving" and had not been fully addressed. As such, a proper treatment plan cannot be developed. While Dr. Mojtahedi did not believe Holaday was ready for CONREP, she did think he was progressing through treatment and activities while at DSH-A.

On cross-examination, Dr. Mojtahedi acknowledged that she was an employee of CONREP and not DSH. One of her roles at CONREP was to visit state hospitals under

10.

the DSH umbrella. Dr. Mojtahedi acknowledged that Holaday had no documented assaults at DSH-A, even though he had been the victim of three assaults while there. She was also aware that not all of Holaday's medications were mental health related and that he had been medication compliant.

While Dr. Mojtahedi agreed that PTSD could be treated and could go into remission, she did not think that was the case with Holaday, as he was still experiencing severe emotional distress over some of the events that took place with the shooting and in combat. Upon further examination by the trial court, Dr. Mojtahedi agreed that she wanted Holaday "to confront himself with the actual details of the shooting," to understand what occurred and, most importantly, what led to it so that he could learn from the risk factors and prevent something from happening in the future.

*Rebuttal*

Psychiatrist Michael McGee, M.D., a graduate of Stanford University School of Medicine who did his chief residency at Harvard University, testified that he had been practicing medicine for 35 years and was currently in private practice and worked at DSH-A. Dr. McGee, who was familiar with Holaday, testified that the CONREP reports showed a lack of understanding, clinically, of "what happened." Dr. McGee had worked with Holaday in weekly individual therapy for almost a year and opined that Holaday was very aware that his triggers were a combination of PTSD and being given a medication, zolpidem, which would very commonly induce blackouts. Dr. McGee described Holaday's crime as an "Ambien-induced blackout in which he misperceived the people in his house as being intruders into the house. And this was related to his hypervigilance from his [PTSD] at the time, where he was very, very concerned about the safety of the home." And although Holaday did not remember what happened, he was told what happened and showed good insight and understanding of the incidents and why.

Dr. McGee, who was an expert in the treatment of trauma, testified that PTSD has about a 70 percent remission rate in five years, even without treatment. He explained that

11.

it could go into remission spontaneously through social support and a person's own process of rallying and coming to terms with what happened to them. With respect to Holaday, Dr. McGee stated "through his containment while at [DSH-A], [he] has had a remission of his [PTSD] symptoms. Dr. McGee found that Holaday showed no avoidance of memories or reminders of his prior trauma, he openly discussed trauma, has had no alterations with mood or cognition associated with trauma, and had largely forgiven himself for his trauma. And he had, because of this, developed a sense of compassion for himself and others.

Dr. McGee criticized the CONREP reports, stating that they did not identify the symptoms that were present and observable to coincide with the PTSD and antisocial personality disorder. Dr. McGee opined that Holaday's PTSD was in remission, he had not been deceitful, and while he had a history of impulsivity and hyperactivity, he had outgrown them.

Other than the Ambien-induced blackout Holaday was in when he committed the crimes, Dr. McGee could see no risk of violence to others, aside from Holaday taking medication which would induce a blackout, him having a lethal weapon, and reexperiencing or misidentifying people as a threat to him.

Dr. McGee acknowledged that Holaday could, at times, be "glib or minimize[ing]," but that he did so to keep from retriggering tremendous shame for his crimes. Dr. McGee described it as compartmentalizing his pain, which actually reduced the risk of recurrence of PTSD. Dr. McGee described Holaday's wanting to move forward and have a career as "quite adaptive and skillful."

Dr. McGee found Dr. Mojtahedi's opinion that Holaday should stay at DSH-A as "really naïve," and he disagreed completely, noting there were harms to continued institutionalization.

Dr. McGee testified that he spoke to Dr. Mu, Ph.D., an evaluator from CONREP, who stated that she felt Holaday should be moved down to the next level of CONREP

and see how he did for a few months before transitioning to standard CONREP, but that Dr. Mu had a "political concern" in doing so, due to the sensational nature of the crime and thought it best to be more conservative in terms of making a recommendation.

Dr. McGee concluded that he thought Holaday was not a risk of or had any desire to hurt anyone, "as long as he doesn't take Ambien and as long as his PTSD remains in remission."

On cross-examination, Dr. McGee described his use of the word "trauma" as Holaday waking up chained to a hospital bed and realizing he had shot several people, including his mother, whom he loved. Dr. McGee also thought Holaday's greatest trauma was his military trauma, with his ADHD at the time, and that he was shamed and demoted in the military when he accidently shot himself. Dr. McGee also opined that there was great trauma when Holaday lost a close sergeant during combat. "So there were multiple traumas that were related to his military experience, and then obviously the trauma of realizing what he did" related to his crimes.

Dr. McGee testified that he spoke to Holaday about killing his stepfather. He did not remember the shooting, but acknowledged that he did it. According to Dr. McGee, Holaday was in an Ambien-induced blackout at the time, and misidentified his own family for intruders. Holaday was hypervigilant, paranoid, and on guard, and he was actively suffering from PTSD. Dr. McGee testified that Holaday was being treated with stimulants for his ADHD, which was completely inappropriate for someone with PTSD. Dr. McGee confirmed that Holaday did not meet the diagnostic criteria for antisocial personality disorder and, in Dr. McGee's care, the treatment was focused on his PTSD.

In a response to Dr. Giordano's March 20, 2023 report, Dr. McGee confirmed that Holaday was aware of his tendency to deny, minimize, avoid and compartmentalize, and that these occurrences could help in not dwelling on the murder, the death of his sergeant, or on shooting himself. Dr. McGee opined that the ability to compartmentalize could be

highly adaptive, and that, rather than pathologize his compartmentalization, Holaday felt well and was functioning well, which spoke for itself.

Dr. McGee testified that, after he read Dr. Giordano's report, he spoke to Dr. David Fennell, a former medical director and board certified forensic psychologist, and with Dr. Scott, a professor of law and psychiatry at U.C. Davis and a forensic psychologist. Dr. McGee reviewed the report and clinical case with both Dr. Fennell and Dr. Scott and both agreed with him that Dr. Giordano broke protocol of standard practice by never speaking to Dr. McGee about Holaday, even though he was his therapist for over a year, and by stating Holaday was a risk of violence to others without any evidence of such.

Dr. McGee explained that he spoke to Dr. Davis, who was Dr. Giordano's supervisor at the time and who signed off on her report, and, after sharing his concerns, Dr. Davis agreed that Holaday was ready to leave the state hospital and that he was not a danger to society. Dr. Davis opined that, while Holaday was ready to go, he might do better in the higher intensity CONREP rather than standard CONREP.

Dr. McGee did not agree with the prosecution that Holaday's diagnosis hinged on having PTSD. According to Dr. McGee, to that presumption you had to add the factor that he was suffering from PTSD and was prescribed and taking Ambien, which caused the Ambien induced blackout. "So, as long as he's not in a blackout, I don't think that he's going to be a risk of harming anybody if he has a recurrence of PTSD and he's getting good treatment and not getting Ambien." On redirect, Dr. McGee explained that Holaday had been prescribed Ambien for PTSD for some time prior to the crimes happening.

Dr. McGee emphasized the need for meticulous, carefully written evidence-based reports — the observations of Holaday by the staff of his behavior on a daily, continuous basis. He also explained the need to be able to compartmentalize on a daily basis, which people do regularly in the world outside of DSH-A.

14.

On redirect, Dr. McGee was asked about the risk factors for alcohol, which was prevalent in the military. Dr. McGee opined that Holaday would have an ongoing risk of relapse to alcohol, but that Holaday was consistently motivated to engage in recovery. Dr. McGee concluded his redirect testimony by stating he did not think Holaday was a risk to public safety, and the next step for him would be healing and growth in a less contained environment.

The trial court questioned Dr. McGee about the term "glib" as others used to describe Holaday. Dr. McGee opined the term referred to people talking about painful things but not showing an appropriate affect to it. Dr. McGee confirmed that he believed Holaday's crimes occurred because he was under an Ambien-induced blackout and dealing with active PTSD, which had him feeling hypervigilant and afraid of intruders. The trial court questioned Holaday's memory loss being attributed to a blackout, noting that Holaday, at some point, during the killing and shootings, mouthed the words "I'm sorry" to his mother and then ran out of the house. Dr. McGee testified that Holaday probably had a traumatic moment realizing what he was doing and then was horrified, all of which was common with Ambien blackouts.

When asked by the trial court, Dr. McGee confirmed that he was aware of Holaday's childhood behavioral and sometimes violent issues. According to Dr. McGee, Holaday was never diagnosed with a conduct disorder, and some of the things Holaday did were not uncommon and such people grow up to be upstanding citizens. Dr. McGee opined that Holaday grew out of whatever impulsive aggression he had as a child and none of that childhood violence exhibited itself when he was in the military. Dr. McGee acknowledged that Holaday had alcohol-use disorder and ADHD, which made it difficult for Holaday in the military, and he had some carelessness and some impulsivity while in the military, but Dr. McGee did not link that to the PTSD and Ambien-induced blackout. Dr. McGee agreed with the trial court that relapse is sometimes part of recovery with regard to alcoholism, but that Holaday had shown consistent motivation to engage in

15.

ongoing treatment when he leaves the hospital, and alcohol was not involved in the current crime.

*The Court's Ruling*

At the conclusion of Dr. McGee's testimony and closing of evidence, the trial court stated it had studied the reports and testimony and found Holaday was an intelligent person who had worked hard at his recovery, and that the outlook for Holaday looked positive.

Ultimately, the trial court denied the petition and ordered that Holaday stay at DSH-A, stating:

> "The issue for me is, are we there yet. And the defense has the burden of proof, granted it's only by a preponderance. I think that the doctor that just testified said some very persuasive things.
>
> "Again, I don't know how much I should be focusing on the incident itself, where someone was killed, at least three or four other people were either shot and wounded or came close to being wounded, including a baby. I'm not going to even talk about the dog, but that was in there, too.
>
> "So I understand what the potential repercussions are if this doesn't work the way everybody would like it to if he were put in a different setting.
>
> "I'm going to rule that the defense has not met its burden by a preponderance of the evidence. I think it's close. And, so I'm going to deny any change in his status."

**DISCUSSION**

Holaday argues that the trial court's finding that he would be a danger to the health and safety of others if released into CONREP was not supported by substantial evidence. He further contends the trial court's finding that he suffered from a mental defect, disease or disorder was also not supported by substantial evidence. We find no error and affirm.

*Governing Principles*

A defendant found NGI may petition the court to be released from a state hospital prior to the expiration of his or her maximum term of commitment on the grounds of

16.

restoration of sanity. (§ 1026.2.) The petition involves a two-step process. The first step is an outpatient placement hearing, at which the applicant must prove by a preponderance of the evidence that he or she will not be "a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community." (§ 1026.2, subds. (e), (k).) If the court makes this finding, the applicant is "placed with an appropriate forensic conditional release program for one year." (§ 1026.2, subd. (e).) "The second step in the section 1026.2 release process is referred to as the restoration of sanity trial, and can only be reached if the applicant has already met the threshold test for placement in 'an appropriate forensic conditional release program.' " (*People v. Dobson* (2008) 161 Cal.App.4th 1422, 1433.) "The applicant again bears the burden to prove by a preponderance of the evidence that he or she will not be a danger due to mental defect, disease, or disorder. (§ 1026.2, subds. (e), (k).)" (*People v. Diggs* (2022) 80 Cal.App.5th 702, 709.)

The present case involves the first step of this process, when the issue "is whether the applicant would not be dangerous if under supervision and treatment." (*Barnes v. Superior Court* (1986) 186 Cal.App.3d 969, 974.) At this stage, the applicant is required "to satisfy a significantly lesser test than he or she must meet at the second proceeding, when the issue is whether the applicant would not be dangerous if unconditionally released." (*Ibid*.)

We review the trial court's order for abuse of discretion. (*People v. Sword* (1994) 29 Cal.App.4th 614, 619, fn. 2.) " 'Under that standard, it is not sufficient to show facts affording an opportunity for a difference of opinion.' " (*People v. Bartsch* (2008) 167 Cal.App.4th 896, 900, quoting *People v. Cross* (2005) 127 Cal.App.4th 63, 73.) " ' "[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." ' " (*Bartsch,* at p. 900.)

*Definition of Danger to Health and Safety of Others*

Section 1026.2, subdivision (e), directs a court to determine whether a person applying for restoration of sanity would be a danger to the health and safety of others, due to mental defect, disease, or disorder, if under supervision and treatment in the community. The section does not define the term "danger to the health and safety of others." Holaday first urges this court to turn to a similar term used in section 1026.5, subdivision (b)(1), which allows commitment beyond a proscribed term where a person represents a "substantial danger of physical harm to others." However, neither the terms nor the sections are comparable.

"All of the persons who are committed by virtue of section 1026 are in the same general class in that they are all insane. It does not follow that, even at the time of hospitalization, they all represent a substantial danger of *physical* harm to others or themselves. Whether they do represent a danger or not, depends on the nature of their mental disease, defect, or disorder and the underlying crime. Neither does it follow that all persons within the purview of section 1026 may become subject to the provisions of section 1026.5, subdivision (b)(1); only the violent offender may be subject to it.... There is no requirement that there be a threat of physical harm to others for commitment under section 1026; and it should not be engrafted onto section 1026.2. Therefore, it is neither logical nor reasonable to make the standard of section 1026.5, subdivision (b)(1) applicable to section 1026.2." (*People v. Woodson* (1983) 140 Cal.App.3d 1, 4.)

*Sufficiency of the Evidence*

The trial court denied Holaday's petition under section 1026.2 after it determined that he would be "a danger to the health and safety of others due to mental defect, disease, or disorder, while under supervision and treatment in the community." (§ 1026.2, subd. (e).) Holaday argues insufficient evidence supports this determination. We disagree. Based on the record, this determination is supported by substantial

evidence, demonstrating that the trial court did not act arbitrarily or capriciously when it denied Holaday's petition.

During the hearing, there was evidence of Holaday's prior violence and history of aggression at a young age, getting into fights and altercations and acting impulsively without consideration of the consequences. His impulsiveness also led to issues while in the military, and ultimately led to shooting and killing his stepfather, and shooting his mother, two other women, and an infant, just five years prior to the filing of his petition.

Dr. Giordano opined that Holaday lacked insight into his mental illness or risk of relapse and his need for additional treatment. Dr. Giordano further reported that Holaday was only able to describe a vague plan for managing his symptoms and/or a possible relapse. While Dr. Giordano's report acknowledged Holaday's symptoms had decreased, it also noted that the symptoms were likely mitigated by Holaday's placement at DSH-A, a controlled environment where he was not exposed to a number of triggers. Dr. Giordano opined that Holaday's risk of violent conduct would likely be mitigated through intensive therapy focused on trauma, the kind of therapy best conducted in a secure hospital setting.

Dr. Giordano's report noted that, in February 2023, Holaday was given a survey at DSH-A requesting that he self-report any PTSD symptoms. He acknowledged being bothered by 12 of the possible 20 symptoms during the preceding 30 days. It was questionable whether Holaday would cooperate with CONREP, having himself expressed that he did not require further treatment and wanted to go back to living with his mother in the house where he committed the crimes.

Dr. Mojtahedi opined that Holaday did not have full understanding of the triggers that caused him to shoot and kill his stepfather, and there was no agreed upon treatment strategy for Holaday. Dr. Mojtahedi, a CONREP doctor, opined that Holaday was not ready for CONREP, noting the lack of clarity or consistency regarding his PTSD

19.

diagnosis; the lack of an agreed upon treatment strategy; and some avoidance by Holaday on learning about the crime, which did not allow him to complete treatment.

Holaday relies on Dr. McGee's testimony, stating it was more persuasive than that of Dr. Giordano's report or Dr. Mojtahedi's testimony. Holaday cites Dr. McGee's testimony that the CONREP report was poorly done and that Holaday's PTSD symptoms had gone into remission. Dr. McGee had testified that, as long as Holaday did not take Ambien and as long as his PTSD stayed in remission, he saw no risk of Holaday harming anyone. Dr. McGee had noted Holaday was actively participating in treatment at DSH-A, and had not injured or threatened anyone while there. Holaday's argument, however, merely shows facts affording a basis for a difference of opinion, not that the trial court exceeded the bounds of reason in its decision. (See, e.g., *People v. Henderson* (1986) 187 Cal.App.3d 1263, 1265-1270 [plurality of experts supported outpatient treatment, only one expert opposed, and that opinion was a sufficient basis to deny outpatient status, "all of the circumstances being considered"].)

Holaday also argues that the trial court, in denying his petition, was overly focused on the shooting and the violent nature of his commitment offense, his childhood behaviors, his military record, and his former alcohol abuse. Holaday argues that this was improper because his past criminal conduct does not reflect his current mental state, which is what is subject to review in a section 1026.2 hearing. Based on our review of the record, we believe Holaday mischaracterizes the trial court's questions and statements, as it was merely fleshing out how and whether these issues might continue to impact his current state.

Holaday further argues that, because he sought release into CONREP, any danger should be viewed in the context of CONREP supervision, as he would be closely monitored. However, at the outpatient placement hearing, the applicant must show that he or she will not be a danger to himself or others, due to mental illness, while under supervision and treatment *in the community*. (*Dobson, supra,* 161 Cal.App.4th at p.

20.

1432; § 1026.2, subd. (e); see also, e.g., *People v. Michael W.* (1995) 32 Cal.App.4th 1111, 1118 [public safety is a factor underlying the requirements of section 1026.2].) Thus, the critical inquiry is still whether Holaday would be a danger in the community.

Finally, Holaday contends that the court's finding that he suffered from a mental disorder was not supported by substantial evidence, citing Dr. McGee's opining that he did not suffer from and was not diagnosed with antisocial personality disorder. And, even if he was diagnosed with such, he contends it is not a basis for a commitment under section 1026, citing *People v. Fields* (1983) 35 Cal.3d 329, 370, in which the Supreme Court stated: "[I]f the defense expert can point to no symptom, no manifestation, of defendant's condition except repeated criminal or antisocial acts, that condition cannot be considered grounds for finding defendant insane." [2]

We agree with respondent that, regardless of whether or not Holaday had an antisocial personality disorder, his commitment is nevertheless proper based on the PTSD and alcohol-use disorder diagnoses. (See *People v. Fields, supra,* 35 Cal.3d at p. 370 [if defendant is denied insanity defense due to having an "antisocial personality" depends on the individual case and the ability of the psychiatrist to base a diagnosis upon facts additional to defendant's criminal and antisocial acts].) We therefore need not address further Holaday's claim that his continued commitment was based on a diagnosis of antisocial personality disorder or that such a commitment violates equal protection.

Holaday's argument simply invites us to reweigh the evidence and conclude that since *some* of the evidence adduced at the hearing does not support the trial court's determination, the determination was not sufficiently supported by the record. That is not

---

[2]     *People v. Fields* stated further, "Indeed the 'antisocial personality' is the classic criminal; our prisons are largely populated by such persons. To classify such persons as insane would radically revise the criminal law — insanity, instead of a rare exception to the rule of criminal accountability, would become the ordinary defense in a felony trial." (*People v. Fields, supra,* 35 Cal.3d at p. 372.)

the function of the appellate court. (See *People v. Maury* (2003) 30 Cal.4th 342, 403 [reviewing court does not reweigh evidence or reassess credibility].) The trial court's conclusion that Holaday is a danger to the community if released into CONREP is sufficiently supported by evidence in the record, including Holaday's own testimony, Dr. Giordano's report, Dr. Mojtahedi's testimony, and even Dr. McGee's testimony that he could not guarantee Holaday would not go into remission. Faced with conflicting opinions from medical experts, the trial court necessarily had to evaluate and weigh the competing views. A trial court "is entitled to consider the validity of the opinions presented to it in determining whether defendant met his burden of proving that he was not dangerous." (*People v. Sword, supra,* 29 Cal.App.4th at p. 630.) The court is not required to follow an expert's recommendation as long as its disregard of the recommendation is not arbitrary. (*Id.* at p. 629.) The fact that some evidence in the record may support a contrary finding does not render the trial court's decision erroneous.

Based on the record before us, we conclude that the trial court did not err when it denied Holaday's petition for release to a supervised outpatient program.

## DISPOSITION

The order denying Holaday's petition for conditional release is affirmed.


FRANSON, J.

WE CONCUR:


LEVY, ACTING P. J.


MEEHAN, J.

22.